MUTUAL BENEFIT HEALTH AND ACCIDENT ASSOCIATION, APPELLANT, V. WILLIAM MILDER ET AL., APPELLEES.

41 N. W. 2d 780

Filed March 16, 1950. No. 32651.

*Lyle Q. Hills, Edward A. Nelson, G. Robert Muche-more,* and *Cleary, Horan & Skutt,* for appellant.

*Jack W. Marer* and *Norman Denenberg,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Mutual Benefit Health and Accident Association, appellant, instituted this action against William Milder and Rose Milder, appellees, to rescind, on the ground of fraud and misrepresentation, a policy of accident and health insurance for which William Milder made application and which it issued to him as insured. Rose Milder, the wife of William Milder, is the beneficiary named in the policy, and is a party only because of this fact. The contest is between appellant and William Milder, appellee, and no further mention of Rose Milder as a party is made herein.

Appellant alleged the policy was issued because of its reliance upon and in consideration of statements made by appellee in the application, which was, by a provision of the policy, made a part of the insurance contract; that the insured knowingly and purposely made untrue and incomplete answers to questions material to the risk contained in the application for the insurance for the fraudulent purpose of inducing the issuance of the policy; that if the answers of the questions had been true and complete, the application would have been rejected and the policy would not have been issued; that the answers were warranties by appellee of the truthfulness and completeness of each of the matters stated by him; and that when appellant learned of the fraud and misrepresentations of appellee it elected to rescind the policy and tendered return of premiums paid with interest, less amounts received by appellee on claims under the policy, which he refused. Appellant seeks a determination of the rights and liabilities of the parties, a rescission and cancellation of the policy, and general relief.

Appellee admits the issuance to him of the policy, the standard provisions thereof as recited by appellant, denies all other claims by it, and alleges as a basis of affirmative relief that the agent of appellant propounded to appellee the questions of the application which he

answered, as explained by him, and after the commencement of this case he first learned that the agent had not truthfully and correctly asked the questions or correctly inserted the answers to them as made by him; that four of the questions were not propounded to appellee or answered by him; and that the answers thereof were fraudulently and·without his knowledge placed there by appellant. Thereby the application was materially altered, is not an application as required by statute, and is void and appellant is estopped from claiming or having any advantage because of it. Appellee requested reformation of the questions in controversy and relief in harmony with his version of the facts. He asserted he had paid all premiums due on the policy; that he was entitled· to recover on it, when reformed in accordance with his claims, $100 a month during the time he suffered total disability and total loss of time from sickness or disease which confined him within doors and required visits therein· by a legally qualified physician; that he had been since May 25, 1942, totally disabled, had sustained a total loss of time from disease, and had been confined indoors within the terms and conditions of the policy; that his disability was permanent; that he had performed all the obligations of the· insurance contract; that there was ·due him thereon as health disability· benefits $100 on May 25, 1942, and a like amount each month thereafter during total disability and loss of time; that he made demand therefor, which appellant refused, but, with knowledge of the facts, wrongfully claimed appellee was not confined indoors under the care of a physician, was entitled to only $50 a month under the terms of the policy, and offered settlement to him on that basis; and that because thereof appellant was ·estopped to claim any other ground of nonliability. Appellee asked judgment for the amount claimed with interest, costs, and attorneys' fees. He alleged·that he paid the premium due August 1, 1942, of $52 to protect his rights in the policy; that it

provides that permanent total disability of insured resulting from sickness relieved him from the payment of any premiums due thereafter; and that he was entitled to judgment for $52 with interest thereon, and to an adjudication relieving him from the payment of any further premiums on the policy.

Appellant replied to the claims of appellee by denial of the new matter and by asserting that he had the policy in his possession, of which the application is a part, for more than six years; that he was barred from claiming that it did not state the answers given by him to the questions therein; and pleaded estoppels because appellee twice made and collected claims under the policy, because he sued appellant on the policy and alleged therein the issuance and validity of it and that a copy of the policy was in the possession of appellee, and because appellee, on at least three occasions since this case was commenced, changed his position in an effort to avoid the effect of evidence produced by appellant that informed appellee that appellant had discovered and knew the facts as to his fraud and misrepresentation in procuring the policy to be issued to him.

The court found in favor of appellees and against appellant; denied its petition and decreed reformation of the part of the policy consisting of a copy of the application as requested by appellee; that he was entitled to $100 a month, with interest on each installment from maturity thereof, as benefits for total, permanent disability and total loss of time, as provided by the policy, commencing with May 25, 1942, and as long as his disability continued; that he should recover $52, premium paid August 1, 1942, with interest; and that appellant should waive all premiums on the policy commencing with that date, and should pay all costs including $2,500 attorneys' fees. The motion of appellant for a new trial was denied, and it appealed.

Appellant contends that each of the findings and the

decree are contrary to the evidence and the law. This is a suit in equity. It must be tried de novo in this court and an independent determination made without reference to the findings or decree of the district court except that where the evidence on any question of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider that the district court observed the witnesses and their demeanor while testifying, and accepted one version of the facts rather than the opposite. Kuenzli v. Kuenzli, 150 Neb. 855, 36 N. W. 2d 247; Maddox v. Maddox, 151 Neb. 626, 38 N. W. 2d 547.

Appellant claims it issued to appellee the policy in consideration of and reliance upon an application made by him and the truthfulness of the answers to certain questions therein. Questions 17, 18, and 12 may be considered together. They are in substance: (17) Do you agree that the policy applied for shall not be binding until it is issued and accepted but while you are in good health and free from injury? (18) Do you apply for a policy to be issued only in reliance on the questions in the application, and that the association is not bound by any statement by or to an agent unless written therein? (12) Have you had any of a large number of named diseases? The answers to the first two are in the affirmative, and to the last in the negative.

The evidence of appellant on the subject of these questions and the answers to them is that the agent who secured the application from appellee was told by him that the only policy he would buy must be noncancellable, and on condition that he be given an opportunity to examine it before he would be obligated. The agent agreed to proceed on that basis. It was because of this that the agent wrote "issued on approval" on the application before it was signed by appellee. The agent asked the questions of the application consecutively as they are numbered and in the order they appear, and wrote therein the answer to each as given by appellee, except the answers to questions 12, 17, and 18. The application

when signed by appellee, taken from his office, and delivered to appellant by the agent, had no answer to any of these questions. His explanation for not inserting an answer to question 12 was: "It was an approval policy" and as to questions 17 and 18, his explanation for the omission was: "I have an idea he was in a hurry and I was in a hurry to get out of there * * *." The application reached the home-office manager of appellant, and he wrote in pencil the answers to these questions. He did not know appellee, had never communicated with him, and did not obtain authority from him to answer the questions. The application was submitted to the underwriter of appellant. The questions were answered on the application when it came to him. He examined it, relied upon the truthfulness and accuracy of the answer to each of the questions, and approved it. The policy was issued and the agent who secured the application took the policy to appellee, called his attention to the insertion of the answers to these questions by the manager of appellant, and the photostatic copy of the application. Appellee read or looked over the application and the policy, retained it, and gave the agent a check for the first premium.

The evidence of appellee is that he did not read the application; that questions 12, 17, or 18, or any of them, were not asked by the agent, and there was no answer to any of them in the application when he signed it; that he relied on the agent to ask the questions, to insert the correct answers, and he relied upon each statement made by him to appellee; that the agent did not say that the policy was to be issued subject to approval by appellee, and he supposed if the application was accepted a policy would be issued; that he gave the agent a check for the first premium when he signed the application; that the policy came to him by mail; and that he did not read it or the photostat attached, but put it in his safe and did not look at the copy of the application attached to the policy until six or seven years later. He first discovered

the answers to these questions were inserted in the application when appellant produced the original application at the first trial of this case in 1944. A person present when the application was prepared in the office of appellee did not hear the agent ask either of the questions now being considered.

Appellant seeks application of the rule that the leaving of blanks in a written instrument after execution and delivery implies authority to fill them and creates an agency in the receiver of the instrument to do so in the manner contemplated by the maker, in the absence of fraud or violation of instructions. The propriety of making an insertion in a completed written instrument depends upon authority to do so. The rule in this jurisdiction is stated in Montgomery v. Dresher, 90 Neb. 632, 134 N. W. 251, 38 L. R. A. N. S. 423: "The filling in of a blank in a written instrument is not, strictly speaking, an alteration of the instrument. Where a blank is filled in, it is a question of authority so to do." See, also, Reilley Bros. v . Thompson, 127 Neb. 683, 256 N. W. 642; Holman v. Higgins, 134 Tenn. 387, 183 S. W. 1008, L. R. A. 1916F 1263, Ann. Cas. 1917E 515; 3 C. J. S., Alteration of Instruments, § 62, p. 976. The weight of the evidence supports a finding that these questions were not propounded to or answered by appellee, and that there was no consideration of or statement concerning any of them by him. The assertion of the agent that he asked appellee the questions, and he gave answers to them as they were later placed in the application, is materially weakened and made improbable by the unsatisfactory and inappropriate explanation that he did not insert the answer to question 12 because the policy was to be issued subject to approval by appellee when the inquiry thereof did not concern any condition attached to the issuance of the policy, but was directed to the health of appellee, and the explanation of the agent that he did not show answers to questions 17 and 18 because he and the applicant were limited for time is not convincing in view of the

very short time required to write the one word answer. Appellant is deprived of the advantage of the rule it suggests by the absence of proof of authority to fill the blanks and the admission of the representative of appellant who supplied the answers to the questions that he did not know appellee, had never communicated with him, and had not been granted authority.

Appellant claims that the negative answer of appellee to question 9 in the application was incomplete and false because appellee had been declined life and disability insurance, and renewal of a disability policy held by him had been refused. The record contains evidence that appellee was not asked this or any similar question; that he was asked by the agent if he had been refused life insurance; he answered he had been by Reliance Life Insurance Company about 1918, and had since then obtained $60,000 of life insurance; and that the agent said: " 'Why, that's a long, long time ago, and since you have obtained all of that life insurance' * * * 'there's no use of my putting that down.' " Appellee believed and relied on his statement. He was corroborated by the person present at the time of the conversation who heard him tell the agent that he had applied to the Reliance Life Insurance Company for a policy which was refused and not issued or delivered. The application of appellee to Reliance Life Insurance Company about 1918 for a life insurance policy was not accepted. He applied to Aetna Life Insurance Company in 1926 for a life insurance policy of $25,000 and was later informed by its agent that the company had a regulation as to the amount it would carry on a risk, and the company would not issue the policy. The agent did not say that appellee as a risk for life insurance had been declined. The company had made extensive investigation because of the application of appellee. A letter of the company states: "* * * our inspection report is clear in every respect," but we do not "* * * care to increase our line inasmuch as we are now carrying $45,000. of insurance on Mr. Milder's life."

The inspection report referred to physical, moral, and financial hazards, and the statement that it was clear meant that the physical examination, moral, and financial position of the applicant were satisfactory. The company was curtailing on larger policies, it had the limit it wanted, and this was the sole reason given for not accepting the offer of appellee. He did not understand or believe that he had been rejected for life insurance. The appellant produced the testimony of its agent who secured the application to the effect that he asked appellee all the questions on it and the answers that appear in it are the answers to the questions as made by him, and that appellee did not state he had been rejected for life insurance by the Reliance Life Insurance Company or the Aetna Life Insurance Company. The appellant also produced the testimony of its underwriter that he relied upon the truthfulness, accuracy, and completeness of the answers to the interrogatories of the application and would not have approved the application or the issuance of a policy to appellee if he had known that he had been declined life insurance and denied renewal of an accident and health policy.

The evidence as to what was or was not said concerning the refusal of Reliance Life Insurance Company to accept the application of appellee for life insurance is in irreconcilable conflict. Appellee claims he informed the agent of appellant of the fact that an application had been made and refused, and that the agent thought the rejection of the application was unimportant and inserted a negative answer to the question in the application. The agent denies this and positively asserts that appellee denied he had ever been refused either life or disability insurance. The trial court saw and heard the witnesses, and obviously accepted the version of the facts given by the appellee. He was corroborated; the agent was not. It is concluded from the entire showing in this regard that appellee informed the agent that he had been rejected for life insurance by the Reliance Life Insurance

Company about the year 1918, and the agent incorrectly answered the question. This situation is not new in this state, and it has been held that where the applicant makes a truthful disclosure and the solicitor of insurance writes a false answer in the application, he acts as the agent of the insurance company, and it is estopped from claiming fraud or misrepresentation. If an application for insurance is drawn by an agent of the insurer and he fills in false answers to the interrogations contained therein which are truthfully answered by the insured, the insurer cannot rely upon the falsity of such answers in seeking to avoid liability under the policy issued upon the application. The agent acts for the insured and it is estopped to base any right upon the default of its agent. Russell v. Glens Falls Indemnity Co., 134 Neb. 631, 279 N. W. 287; Roth v. Employers Fire Ins. Co., 123 Neb. 300, 242 N. W. 612; Fadden v. Sun Ins. Office, 124 Neb. 712, 248 N. W. 62; Rubinson v. North American Accident Ins. Co., 124 Neb. 269, 246 N. W. 349; Metropolitan Life Ins. Co. v. Alterovitz, 214 Ind. 186, 14 N. E. 2d 570, 117 A. L. R. 770; 29 Am. Jur., Insurance, § 242, p. 238.

Appellant refers to and quotes Gillan v. Equitable Life Assurance Society, 143 Neb. 647, 10 N. W. 2d 693, 148 A. L. R. 496, in reference to its assertion that appellee should not have been permitted to contradict, by oral evidence, parts of the application for the insurance. The discussion of that subject and the rule adopted in that case are limited to actions at law for a recovery on the policy and are not pertinent to this or any case in equity to reform, cancel, or rescind an insurance contract. This appears from the language therein: "The proper rule of law is that in an action at law on an insurance policy an assured may not, by parol evidence, impeach the written statements of the assured in the application in those cases where the application has become a part of the contract * * *." Likewise, the reference therein and quotation from the case of Lumber Underwriters of New York v. Rife, 237 U. S. 605, 35 S. Ct. 717, 59 L. Ed. 1140, as follows:

"Of course if the insured can prove that he made a different contract from that expressed in the writing he may have it reformed in equity. What he cannot do is to take a policy without reading it and then when he comes to sue at law upon the instrument ask to have it enforced otherwise than according to its terms. The court is not at liberty to introduce a short cut to reformation by letting a jury strike out a clause." The terms of a written contract may not be varied or contradicted by parol evidence. A party may not generally avoid the effect of a written contract by showing he signed it without reading it or in ignorance of its provisions, but he may have relief from its terms for fraud or any other recognized equitable ground. The general rule referred to is not applicable in an action between the parties to the contract where the basis of the relief sought is that the writing by reason of fraud or other recognized equitable ground does not express the agreement actually made. Reilley Bros. v. Thompson, *supra.*

The evidence above summarized shows that appellee made an application to Aetna Life Insurance Company for a policy of life insurance. It was not accepted because the company did not desire to increase the amount of insurance that it then had on his life. The reason for the failure to issue the policy had nothing to do with appellee's desirability as a risk. It is generally considered that a false answer to the inquiry of whether or not the applicant had been rejected for life insurance is material to the risk and affords ground for avoiding the policy upon proof of falsity of the answer. It is a matter peculiarly within the knowledge of the insured. In Muhlbach v. Illinois Bankers Life Assn., 108 Neb. 146, 187 N. W. 787, this court said: "Where the question in the application calls for an answer peculiarly within the knowledge of the applicant, an untrue answer relating to a matter material to the risk and relied upon by the insurer will avoid the policy. * * * In Swanback v. Sovereign Camp, W. O. W.; 103 Neb. 34, the insured falsely stated

that he had never been rejected by any other insurance company in applying for life insurance, and it was held that the false statement avoided the policy. It will be observed that the questions asked in these cases called for information peculiarly within the personal knowledge of the applicant." See, also, Gillan v. Equitable Life Assurance Society, *supra;* George v. Guarantee Mutual Life Co., 144 Neb. 285, 13 N. W. 2d 176.

The situation here is entirely different. The non-acceptance of the application of appellee by the Aetna Life Insurance Company was because he already had insurance equal to the limit it desired to accept. This did not require him to disclose the facts in a subsequent application for insurance. Such a declination of an application for insurance is not material to the risk in the sense that it must be disclosed by the applicant for subsequent insurance. In Solez v. Zurich General Accident & Liability Ins. Co., 54 F. 2d 523, the facts were that the insured had been issued an accident policy by the defendant and suit was brought thereon by his beneficiary. It was contended that he had been guilty of fraud and misrepresentation by denying in his application for insurance to defendant that a prior application made by him to Metropolitan Life Insurance Company for a health and accident policy had been rejected. The evidence disclosed that his application to that company was rejected because at that time it had issued indemnity policies to him in excess of the limit under the rules of that company. The court held that the insured had not made a misrepresentation or been guilty of fraud as a matter of law. It said: "Rejection of application because insured already had insurance exceeding insurer's limit held not material to risk as respects necessity of disclosure in subsequent application to another company." In the opinion the court observed: "The last application to the Metropolitan Life Company was indeed rejected, but the plaintiff learned of the reason, which had nothing to do with his desirability

as a risk. He could not have supposed that the question included such a transaction, and in fact it did not concern the risk at all." In 1 Appelman, Insurance Law and Practice, § 291, p. 326, the author says: "A rejection of an application for additional insurance * * * need not be disclosed, particularly where the reason for rejection is on the ground that the applicant already has insurance exceeding the insurer's limit."

Appellee had an accident and health policy in existence on April 1, 1926, by the United States Fidelity & Guaranty Company, and it was discontinued at the end of a policy period. The experience of the appellee with the company in the settlement of a claim by him under the policy was unsatisfactory and he told the agent of the company who had acted in reference to the insurance that when the time came for renewal of the policy he did not want it renewed. He explained these facts to the agent of appellant at the time the application was made for the policy involved in this case. A witness testified that he heard appellee tell the agent at the time the application was prepared that he had cancelled a policy issued to him by the United States Fidelity & Guaranty Company. The man who was agent for this company at the time the policy was issued to appellee and important to the discontinuance of the policy testified that he was then writing insurance, collecting premiums on business produced by him, and handling renewals for the company; that appellee told him that he was dissatisfied with the settlement of his claim made by the company and that the agent should not renew his policy with that company; and that the agent then notified the company that the appellee had informed him not to renew the policy and asked the company that the policy not be renewed. The agent of appellant denied the testimony of appellee that he had advised the agent the facts of the discontinuance of this policy of the United States Fidelity & Guaranty Company. It is claimed that the negative answer to the inquiry

in the application, has any renewal of disability insurance been refused, was false and a fraudulent misrepresentation of a material fact within the knowledge of the insured sufficient to avoid the policy here in controversy.

The evidence is convincing that putting an end to the policy issued to appellee by the United States Fidelity & Guaranty Company was at his request, by his direction, and with his consent, and that it was a surrender and not a cancellation or refusal to renew. There is no evidence in this record that the company did anything toward discontinuing the policy until it was informed not to renew or continue the policy. An insurance company might well regard it as a fact material to be known by it in passing upon the acceptance of a risk that insurance previously secured by the applicant had been regarded by the insurer as an undesirable risk and had been discontinued. The fact that there had been a previous voluntary surrender of an insurance policy by the insured would be of slight, if any, importance. If appellant regarded the previous surrender of a policy by the applicant as a fact material to be known by it, it should have specifically required information as to that, as well as concerning the prior cancellation or refusal to renew any policy. Rabin v. Business Men's Association, 116 Kan. 280, 226 P. 764, 38 A. L. R. 26. This objection cannot be sustained.

Appellee by his answers to inquiries of the application asserted that he was sound physically and that he had not had medical or surgical treatment or any local or constitutional disease not previously mentioned therein within five years of June 26, 1936. Appellant claims the representations thereby made were knowingly false and fraudulent and entitles it to be relieved of any liability because of the policy issued appellee by it in reliance on the truthfulness of his answers.

Appellant produced evidence that appellee was at the Mayo Clinic in Rochester, Minnesota, on the 16th day of August 1934, and talked with a specialist in internal

medicine who was also a senior consultant in digestive troubles. Appellee, at the suggestion of the doctor, talked with two other members of the staff. He did not go through the clinic. He had no laboratory work or physical examination, and no examination of his head. He was given advice and a prescription. He had been at the clinic before, and many times a person who has registered previously returns and does not have a complete recheck. That is what he did. He consulted the doctor as a specialist in allergies because he heard he was interested in this problem. Appellee complained of hives with which he had suffered except for periods of remission since the age of 16. He did not mention dizziness or deafness, and made no complaint of faulty hearing in 1934. The doctor had no memory or record that appellee had Meniere's syndrome in 1934. "I don't remember that we talked about the Meniere's." The discussion on his visit was hives. Appellee had a tendency to get big hives on any part of his body. He said once or twice he nearly lost his life because his throat swelled up, he would have a pain in his abdomen, and that is definitely associated in medical science with hives. The hives might come in his ears or brain or pinch the nerves in the ear. This gave the doctor the thought that the hives were connected with Meniere's disease. He suspected this, but could not prove it. He had a distinct memory of a consultation revealing appellee had Meniere's disease. "Oh, yes; very distinct with regard to 1941 and 1942 but not 1934." Such a conclusion was not made in 1934 because appellee was there one day to discuss with the doctor one problem—hives. A person might have hives and live a normal life. "In most instances they are not disabling * * *." It was in 1941 for the first time he had an opinion as to Meniere's syndrome. He and his associates in 1941 for the first time, after appellee had gone through the clinic very completely and four or five had examined him from different aspects, believed appellee had Men-

iere's syndrome with nerve deafness, and that the symptoms ran back for years. This is when appellee was told he had this disease. A specialist in nervous and mental diseases examined the nervous system of appellee at the Mayo Clinic in March 1941, and found some disturbance with the function of his eighth nerve on the right side which had to do with hearing and balance, but did not determine the cause of the trouble. The nature of the ailment was that he had a progressive dizziness involving the eighth nerve.

A specialist in diseases of the ear, nose, and throat made an examination of appellee at the Mayo Clinic on March 11, 1941, and it was negative except a bilateral nerve deafness with giddiness and some of the characteristics of Meniere's disease, but not definite at that time, and he did not conclude that the patient was afflicted with that disease. The doctor first testified he had no recollection of appellee, anything he said, or of the examination, except as shown by the record; that he had no memory of any statement made by appellee as to the duration of his trouble; but later testified that appellee said it had been 16 or 17 years. Appellee had no objective symptoms, and the doctor based his information upon what he claims appellee told him. He said giddiness may be produced by a great many things such as eye disorders, anemia, certain diseases involving the cerebellum, and other similar conditions.

The evidence of appellee was in substance that:

An eye, ear, nose, and throat specialist of Omaha who had been acquainted with appellee from childhood and had a professional relationship with him from 1936 until 1942, testified he gave him treatment in June of 1936 for sore throat and nasal cold; that appellee was not then afflicted with Meniere's syndrome, and that there was no evidence that he was at any time from then until sometime in 1941. An Omaha physician, a specialist in internal medicine, testified appellee had been his patient since February 10, 1942, until November 21,

1947. He made an examination of him on February 10, 1942, and found he had Meniere's syndrome. There is no specific treatment or known cure for it, and his opinion was that appellee is permanently and totally disabled. He testified that hives, or urticaria, are an allergic manifestation, cause not always known, characterized by skin eruptions, look like flea bites, come out spontaneously on the body, and produce itching. They come and go, usually in a matter of hours, sometimes over a long period, and sometimes don't recur for years. Hives are not serious and do not seriously affect the health of a person who has them, and they do not prevent a person afflicted from carrying on his usual business or occupation. When he took the history of appellee he stated that he had had hives, but the doctor did not recall that he had an attack of hives since he first saw him in 1942. Hives, or urticaria, are not a symptom of Meniere's syndrome.. He never knew of any kind of hives causing the death of any person. Appellee did not suffer from angioneurotic edema at any time while appellee was his patient.

Appellee was 54 years of age on June 26, 1947, has a business education, and is a graduate pharmacist. He was employed in a retail pharmacy in Omaha from 1914 until 1915; he owned and operated a retail drug business from 1915 until 1918; he was in the Army from September 18, 1918, to February 15, 1919; from 1919 until February 8, 1933, he personally operated the retail drug business again; he was associated with his brother in the Milder Oil Company for about two years; and he was engaged in the wholesale liquor business as owner and manager from the spring of 1935 until April 30, 1942. He was active, worked long hours, performed arduous work, and lost no time from his employment or business because of illness of any nature from 1914 until the early part of 1942, except for about a week in 1925 when he was operated on for piles or fistula, about four or five months as a result of an accident in July of

1937 resulting in hernia, and about a year after he suffered the hernia, he was disabled for 12 days caused by a diseased appendix and an operation for its removal. He had hives all his life, but was never disabled or lost any time because of them. They would appear for an hour or two and would be gone. He always had periods of remission; sometimes he would not have an attack for as much as five or six years. They were evidenced by a breaking out about the size of a small sleeve button. He never had giant hives or a hive in his throat, never carried any instrument to administer injections to himself as a relief for hives, and never told anyone that he had. He was at Mayo Clinic in 1925 after his operation for piles, and had a check-up. He took his mother, his sister, and her daughter to the Mayo Clinic in 1934. His mother had been ill and was unable to get a diagnosis of her trouble. His niece was allergic, and she was trying to find the cause of it. Appellee did not go to the Mayo Clinic at that time for himself. While he was there he talked with Dr. Alvarez, who was a sufferer from hives. He was not given any treatment or prescription. He at that time made no complaint to anyone about loss of hearing, dizziness, or any condition, except a statement that he had had hives for 16 or 17 years. There was nothing said about dizziness, a hive in his throat, or a hive on his brain, and he made no statement that he was suffering from angioneurotic edema, and the fact was he had none of these conditions. He was not advised in 1934 by Dr. Alvarez or any other doctor that he was suffering from Meniere's disease or had a Meniere's syndrome. His contact with Dr. Alvarez in 1934 at the clinic was not more than ten minutes. He was examined at the Mayo Clinic in March of 1941. No one then told him that he had Meniere's disease, and he had no knowledge that he was suffering from any condition of that kind. He carried on his usual business and was in good health until about January 1942. He consulted Dr. Thompson

in February of 1942, who referred him to Dr. Young. Dr. Thompson told appellee that he had Meniere's syndrome, that he ought to get out of business and take a complete rest for six months or a year. His condition got worse, and he had his business liquidated by April 30, 1942. He had a severe attack on May 25, 1942, and since that time he has been disabled. He returned to the Mayo Clinic in June of 1942, and it was then that Dr. Alvarez told him that he and the consultants had concluded that he had Meniere's syndrome.

Appellee told the agent of appellant at the time the application was taken that he was at the Mayo Clinic in 1934 in reference to hives which he had had all his life, and the agent said: " 'one out of every ten people are allergic so,' * * * 'I don't have to put that down.' " Appellee was corroborated by the testimony of his wife, and his nephew, who worked with appellee beginning in 1934. He testified that he was present when the application for insurance was taken, and he heard appellee tell the agent of appellant about his hives and the fact that he had been at the Mayo Clinic.

The evidence is convincing that the fact that appellee was affected with hives cannot be associated in any way with Meniere's disease with which he has suffered since 1942. There is a failure of proof that hives are a symptom, cause, or aggravation of Meniere's syndrome. These have not been in any way connected. There is no support by anything in the record of a claim that appellee had any reason to believe that he was affected by any disease except hives on June 26, 1936, the date of the application for the insurance. He at that time told the agent he had hives and had been to the Mayo Clinic. It was in the early part of 1942 that anyone formed an opinion that appellee had Meniere's disease, and he was for the first time so advised and charged with notice that he probably had it. It is this disease that caused the disability of appellee. Any ordinary, reasonable, disinterested person with knowledge of the facts as they

existed at the time the application was made, as shown by the record, would have believed appellee was then sound physically and that he had not had medical or surgical treatment for any disease not explained to the agent within five years of that time. He was justified in believing and saying he was sound physically. He had worked long hours without loss of time all his mature years, except for the three brief periods mentioned in the summary of the evidence. He was accepted for military duty; qualified for more than $50,000 of life insurance; and had operated and was then operating a successful business. There is absence of any fact from which intent or purpose to deceive in this respect could be inferred. In Carpenter v. Sun Indemnity Co., 138 Neb. 552, 293 N. W. 400, it is said: "Untrue representations made by the assured in his application, where the questions eliciting such statement call for matters of opinion, judgment, or belief, will not avoid a policy issued thereon, unless it is shown that the misrepresentations were knowingly made with intent to deceive." See, also, Muhlbach v. Illinois Bankers Life Assn., *supra*.

The appellant argues that the retention of the policy with a copy of the application attached thereto by appellee was a ratification and adoption of all statements appearing in the application; that appellee is estopped from asking or having reformation of the application; and that the insured was bound as a matter of law to know the contents of the application. When the insured states the facts correctly to the agent of the company, he is not bound to exercise vigilance thereafter to determine whether or not the agent exercised care, good faith, or truthfulness in his transactions on behalf of the company. The company is estopped from seeking to avoid its contract because of a mistake or fraud committed by its agent, if the insured acted in good faith, although he may have been negligent. The case of Robinson v. Union Automobile Ins. Co., 112 Neb.

32, 198 N. W. 166, is pertinent to this contention. Therein it is said: "It is next contended that, where a party accepts a contract of insurance and makes no effort to examine or read the policy until a loss occurs, he is bound by the terms of the policy as written. Several authorities are cited as sustaining this principle, * * *. The cases cited, however, in the main are actions on contracts as written and where one or the other of the parties seeks to avoid the legal effect of some clause in the contract of which he had no personal knowledge. They are not actions for reformation of the contract. In such an action, where one party seeks the aid of a court of equity to require the contract to conform to the actual intent and agreement of the parties, a different rule is applicable. It is a general principle, sustained by abundant authority, that if, by inadvertence, accident, or mutual mistake, the terms of the contract are not fully set forth in the policy, it may be reformed so as to express the real agreement." See, also, Mogil v. Maryland Casualty Co., 147 Neb. 1087, 26 N. W. 2d 126.

Appellant has not established a right to have the policy rescinded or cancelled. The appellee has shown good cause for reformation of the policy in the respects requested by his final pleading herein.

Appellee claims he became totally disabled from disease or sickness on May 25, 1942, and because thereof, has since suffered total permanent disability and total loss of time, and is entitled to monthly payments of $100 a month commencing on that date and continuing during disability because of "PART J" of the contract of insurance, as follows: "For total disability resulting from disease, the cause of which originates more than thirty days after the effective date of this policy, the Association will pay for such loss of time, beginning with the THIRTY-FIRST day of disability: (1) MONTHLY INDEMNITY AT THE RATE OF ONE HUNDRED ($100.00) DOLLARS. . .So long as the Insured lives

and suffers total disability and total loss of time from sickness or disease which confines the Insured continuously within doors and requires regular visits therein by a legally qualified physician, or (2) MONTHLY INDEMNITY AT THE RATE OF FIFTY ($50.00) DOLLARS. . .So long as the Insured lives and suffers total disability and total loss of time from sickness or disease which does not continuously confine the Insured within doors but requires regular medical attention. * * *"

The evidence is that on May 25, 1942, the insured suffered sudden, severe illness with unconsciousness and recurring unconsciousness at intervals for four or five hours resulting in disability which confined him to his bed for two or three days, and at his home the balance of that week. This was the first illness he had of this character. Dr. Romonek and Dr. Greenberg were called and attended him at his home on May 25, 1942, and Dr. Romonek saw him from time to time during his confinement at home because of this attack. About a week later, while he was shaving in the bathroom, appellee became unconscious, fell, injured himself, and was cared for by Dr. Romonek and Dr. Thompson in his home. On Saturday night following the bathroom incident, he had an attack resulting in unconsciousness, and was attended by Dr. Romonek. Early in June 1942, he, accompanied by his wife, made a trip by train to Rochester, Minnesota, was examined at the Mayo Clinic, and remained there about two weeks. The first part of July he made a trip with Dr. Romonek to Chicago and consulted with and was examined by Dr. Brunner, a specialist. He had an attack resulting in unconsciousness after he returned from Chicago. Dr. Thompson cared for him at his home. He made a trip to Chicago by train in August of 1942 accompanied by his younger son, and while there consulted with and was examined by Dr. Brunner a second time.

Appellee has been for many years afflicted with hives or urticaria, an allergic manifestation characterized by

an eruption of the skin and mucous membranes, on any part of the body, that produce severe itching. They are subject to extended periods of remission. Vasomotor disturbance or angioneurotic edema is a spasm of a group of large blood vessels at the base of the brain. It became known in February of 1942 that appellee had Meniere's syndrome, which means generally injury to some part of the hearing mechanism of the ear, or along the nerve back into the brain, and is associated with attacks of nausea, vomiting, dizziness, buzzing in the ears, and deafness, and accompanied by sudden and unpredictable spells of a few minutes to one-half hour of instability to the extent that the individual affected may fall and suffer unconsciousness. The balancing mechanism of the inner part of the ear is the labyrinth, and Meniere's disease may be due to its inflammation, or labyrinthitis, sometimes called vasomotor disturbance, resulting in a congestion of the blood vessels and a pressure on the inner ear. He was compelled to discontinue his business and all kinds of work, and since May 1942, has been prevented from engaging in any kind of gainful employment or activity. The cause of his disability is incurable and permanent.

Appellee, in February 1943, made trips from his home to a downtown office in Omaha, and conducted negotiations for the settlement of his claims against appellant on account of his disability. He, accompanied by his wife and daughter-in-law, went by automobile from Omaha to Florida the first of May 1943, and remained until June 21. There was provision for fishing where they stayed, and he fished two or three times a week. There is no showing that he saw, consulted, or was treated by a doctor while there. In December 1943, he, Mrs. Milder, his son, and daughter-in-law, made a trip from Omaha to California and lived at San Bernardino, California, several months. Dr. Romonek had moved from Omaha to California in June of that year. The distance between his office and where Milder lived was about 70 miles.

Milder made trips from there to the office of Dr. Romonek for treatments about three times a week while in California. He traveled by automobile and drove the car a part of the time on these trips. He did some fishing. The record does not show that any doctor called on Milder. Late in July 1946, he made a trip from Omaha to International Falls, Canada, in company with "Bill Boazberg and a friend of his" on a fishing trip. He made a trip from Omaha to Chicago soon after Thanksgiving in 1946 unaccompanied, so far as the record shows, and while there he saw and was examined by Dr. Brunner. He made a trip from Omaha to Pittsburgh, Pennsylvania, early in December 1946, alone so far as the record indicates, and while there consulted and was examined by a specialist recommended to him by Dr. Thompson. He, Mrs. Milder, and their daughter made a trip from Omaha to Kansas City, Missouri, by automobile in May or June 1947, the purpose of which is not shown, and he and his wife made a number of trips from Omaha to Kansas City, Missouri, after May of 1942, sometimes by train and sometimes by automobile. The purpose of these trips is not stated. He, accompanied by his wife, made a trip to New York by automobile in July 1947, to attend a business meeting and have a vacation. The trip was of ten days' or two weeks' duration. He operated an automobile sometimes when he was alone, but more often when someone was with him. He preferred riding in a car rather than walking, and drove a car lots of times when he was alone. "I just can't stay home." He made trips from his home in Omaha, at 4815 Davenport Street, to the tavern operated by his sons on North 16th Street, almost every day. "I might as well spend my time there as wearing some of my friends out in their other businesses * * *." He operated the cash register in the tavern, and he sometimes served himself and his friends with food in the tavern. Since May 25, 1942, he spent his time staying home, coming down town, visiting, fishing, and going for a walk frequently. The condition of appellee

during the trial of this case was worse than at any other time after June of 1942. He attended the trial and was a witness on seven days. The record does not show that he had occasion for, or received medical treatment while attending the trial, or that there was a recess or any postponement because of his ill health. It does show that he became emotional on one occasion, and a recess of ten minutes was taken, at the end of which he resumed the witness stand. Dr. Warren Thompson of Omaha was the appellee's doctor from February 10, 1942. He was, according to the record, at the home of appellee to render him professional services on two occasions—about a week after May 25, 1942, and on October 31, 1944. Appellee frequently visited the office of Dr. Thompson, but there were periods of three to six months during which Dr. Thompson did not see him.

The policy must be construed, as any other contract, in accordance with its general scope, its design, and the intention of the parties at the time it was made as disclosed by the whole instrument. There is no assertion that there is ambiguity or inconsistency in the part of the policy providing health or illness indemnity. These provisions are clear and unambiguous, must be taken and understood in their plain and ordinary meaning, and applied in a reasonable manner. Smith v. United States Fidelity & Guaranty Co., 142 Neb. 321, 6 N. W. 2d 81; American Life & Accident Ins. Co. v. Nirdlinger, 113 Miss. 74, 73 So. 875. The immediate problem is the amount of recovery permissible to appellee because of his disability resulting from ill health. The provisions of the policy containing and limiting the obligation of appellant on this subject have been set out. The answer to the problem turns upon two clauses in the part relating to total disability and total loss of time from sickness or disease "which confines the Insured continuously within doors and requires regular visits therein by a legally qualified physician" and "which does not continuously confine the Insured within doors but requires regular

medical attention." Appellee insists that the vital condition of recovery in accordance with the first provision of the part quoted is total disability, and if the insured is totally disabled, it can make no difference in the risk whether or not he is continuously confined within doors or departs therefrom frequently and repeatedly, if such departure and traveling about is for reasonable purposes with the approval and advice of his physician in an endeavor to restore his health. Similar clauses to these have frequently been considered by the courts, and different results reached. The decisions are not in harmony and cannot be reconciled. Each case depends largely on its particular facts and the language of the contract. Mackprang v. National Casualty Co., 127 Neb. 877, 257 N. W. 248. The contract of insurance with which this case is concerned plainly contemplates two degrees of illness —"one that confines the insured continuously within doors" and "one that does not continuously confine the insured within doors" although the insured must in either instance be totally disabled and require medical attention. Mere total and permanent disability of the insured by disease or illness is not sufficient. The contract makes total disability and total loss of time from sickness or disease which confines the insured continuously within doors and regular visits therein of the insured by a legally qualified physician an indispensable criterion of disability which entitles the insured to the maximum indemnity. Reeves v. Midland Casualty Co., 170 Wis. 370, 174 N. W. 475; Federal Life Ins. Co. v. O'Connell's Committee, 276 Ky. 606, 124 S. W. 2d 1043; Mutual Benefit H. & A. Assn. v. Ferrell, 42 Ariz. 477, 27 P. 2d 519; Sawyer v. Masonic Protective Assn., 75 N. H. 276, 73 A. 168; Carabelli v. Mountain States Life Ins. Co., 8 Cal. App. 2d 115, 46 P. 2d 1004; Garvin v. Union Mut. Casualty Co., 207 Iowa 977, 222 N. W. 25, 61 A. L. R. 633.

There are two provisions in the policy for illness disability benefits. Both require that the disease must occasion total disability and total loss of time, and that the

insured have regular medical attendance. The only difference in the conditions of these is that the first is mandatory that the disability shall confine the insured continuously within doors. The second requires only nonconfining disability. Obviously the feature which distinguishes confining disability and nonconfining disability within the terms of the policy is the continuous confinement within doors and regular visits and treatment by a physician. If the words "which confines the insured continuously within doors and requires regular visits therein by a legally qualified physician" are to have the meaning as contended by appellee, they are wholly disregarded and read out of the contract, and in that view there is no purpose for, effect, or meaning of the second provision relating to nonconfining disability. This may not lawfully be done. The parties agreed by the contract that insurance should be paid according to the degrees of sickness which incapacitated the insured, and that the maximum benefits should be measured by continuous confinement within doors. The court is not warranted in ignoring this unambiguous condition by construction or arbitrary disregard of the terms of the contract. The clause relating to nonconfining sickness can no more be disregarded than those limiting the time for which the insurance shall be paid. To do so would be to make a different contract than the parties made. Reeves v. Midland Casualty Co., *supra;* Mutual Benefit H. & A. Assn. v. Ferrell, *supra;* Federal Life Ins. Co. v. O'Connell's Committee, *supra.* The entire contract must be regarded with a conscious effort to give effect to every part of the instrument without disproportionate emphasis upon one to the neglect of other provisions. Smith v. United States Fidelity & Guaranty Co., *supra;* Central Nebraska Public Power & Irrigation District v. Tobin Quarries, Inc., 157 F. 2d 482.

A health and accident insurance company may limit its liability in any reasonable manner. The provisions of the policy involved in this case recognize that hazard

in health insurance is greater than in accident insurance. Ordinary knowledge and experience support that view. The symptoms of disease are frequently only subjective, while in cases of accident the evidence is more commonly objective. The terms of the policy also recognize that with unguarded health policies, slight illness might tempt an insured to seek relaxation from ordinary labor or activity at the maximum expense of an insurer. If, however, the claimant in order to enjoy the fruits of his simulations must be confined continuously within doors and have regular visits therein by a physician, he will quickly grow weary of them. It is to discourage doubtful claims of total disability from illness or the protraction of illness for the purpose of securing maximum benefits of insurance contracts that insurers condition full indemnity to confinement indoors accompanied by regular medical attendance. This is the character of the contract under which appellee claims. It does not unreasonably limit liability, and no principle of public policy is thereby contravened. Hamilton v. Mutual Benefit Health & Accident Assn., 133 Neb. 464, 275 N. W. 863; Stone v. Physicians Casualty Assn., 130 Neb. 769, 266 N. W. 605; Pirscher v. Casualty Co. of America, 131 Md. 449, 102 A. 546, L. R. A. 1918B 996; Rocci v. Massachusetts Accident Co., 222 Mass. 336, 110 N. E. 972, Ann. Cas. 1918C 529.

A construction of the contract sufficiently liberal to comprehend maximum recovery by appellee is urged. It is a sound principle of law that doubt and ambiguity in an insurance contract should be resolved in favor of the insured. Frequent decisions of this court affirm this rule, but this doctrine does not mean that a clear provision of the contract is to be ignored or words stretched to include gratuities. The language from another decision quoted with approval in Stone v. Physicians Casualty Assn., *supra,* clearly states this: " 'It does not follow, however, that the terms of an insurance policy may be distorted from their natural meaning, or that the agreed liability of the insurer should be enlarged into one

which only a new contract could have imposed, nor, indeed, that a court should indulge in scholastic subtleties to extend the rights of the insured. * * * Courts should not be "cunning and astute to evade, rather than quick to perceive and diligent to apply, the meaning of the words," as manifestly intended by the parties.' "

The condition imposed by the contract that continuous confinement within doors with regular medical attendance is a requirement of recovery of maximum indemnity for total disability and total loss of time occasioned by illness or disease should not be literally but reasonably applied, and the insured is not thereby required to remain within doors constantly, but there must be a substantial confinement within doors and regular medical attendance therein by reason of the illness. There may be needful and beneficial interruption of the confinement with the approval and advice of his physician in attempts to restore the health of the insured, and there may be necessary deviation from confinement indoors on account of occurrences or emergencies over which he has no control, but this does not mean that the requirement of confinement within doors may be ignored or disregarded, and recovery had under this provision of the policy merely because insured is totally disabled and suffers a total loss of time. If an insured is able to and does leave his home and travels about as he desires for purposes not connected with his sickness, as the evidence summarized herein shows appellee did for the larger part of the time with which this case is concerned, he is not continuously confined indoors within the meaning of a policy of the kind involved herein. While the extent of the disability of insured to pursue his usual business activities could not well have been greater, nevertheless the record fails to show his disability falls within the contractual classification which entitles him to full indemnity for the entire time of his disability. Mackprang v. National Casualty Co., *supra;* Hines v. New England Casualty Co.,

172 N. C. 225, 90 S. E. 131, L. R. A. 1917B 744; Massachusetts Protective Assn. v. Picard, 76 F. 2d 684; Garvin v. Union Mutual Casualty Co., *supra;* Federal Life Ins. Co. v. O'Connell's Committee, *supra;* Pirscher v. Casualty Co. of America, *supra;* Mutual Benefit H. & A. Assn. v. Ferrell, *supra;* American Life & Accident Ins. Co. v. Nirdlinger, *supra.*

The finding is that appellee was disabled by a confining illness, within the terms of the policy, commencing May 25, 1942, and continuing until the first day of May 1943, and because thereof he is entitled to recover from appellant commencing on June 25, 1942, at the rate of $100 a month, as provided by the policy, with interest on each installment from the time due; that he has been disabled by nonconfining illness, within the provisions of the policy, from May 1, 1943, and is entitled to recover from appellant on account thereof at the rate of $50 a month from that date and as long as his said disability continues, with interest on each installment from the time it matures; that no premium on account of the policy of insurance became payable on or after August 1, 1942, and no obligation on appellee to pay any premium has since existed, or will exist while his total and permanent disability continues; and that appellee is entitled to recover the sum of $52 with interest thereon from August 1, 1942, on account of the premium paid that date on the policy.

The judgment should be, and is, that the decree of the district court is reversed and the cause remanded with directions to the district court to enter judgment as follows: That the petition of appellant be denied; that the policy of insurance involved herein be reformed in the respects requested in the last pleading of appellee, William Milder, in the district court; that appellee have and recover from appellant for the period of May 25, 1942, to May 1, 1943, $100 a month with interest on each installment from maturity; that the first payment became due June 25, 1942; that appellee have and

recover from appellant $50 a month from May 1, 1943, as long as his disability as herein found continues, with interest on each installment from the time it is due; that no obligation on appellee to pay premiums on the policy involved herein existed on August 1, 1942, or since, or will exist while appellee suffers total and permanent disability; and that appellee have and recover from appellant $52 with interest from August 1, 1942, and the costs of this appeal, including the sum of $2,500. allowed in the district court and the sum of $1,000 in this court as compensation for the attorneys for appellees.

REVERSED AND REMANDED WITH DIRECTIONS.