JOE GERSHCOW, SOLE TRADER *d. b. a.* GERSHCOW FUR
COMPANY, v. HOMELAND INSURANCE COMPANY
OF AMERICA.[1]

June 16, 1944.

No. 33,550.

*Oppenheimer, Hodgson, Brown, Donnelly & Baer* and *Wood R. Foster,* for appellant.

*William M. Serbine* and *Sydney W. Goffstein,* for respondent.

JULIUS J. OLSON, JUSTICE.

Action to recover the value of certain sample fur coats destroyed by fire while on exhibition in the department store of Herberger-Hart Company at St. Cloud, hereinafter referred to as Hart. The amount of plaintiff's loss was stipulated to be $1,782.50, leaving as

[1]Reported in 15 N. W. (2d) 88.

the only issue to be tried the question whether the destroyed garments were included in the policy coverage. Tried to the court, there were findings for plaintiff. Defendant's motion for amended findings or new trial was denied, and it appeals.

Two policies are involved. The one upon which plaintiff's case rests is designated in the record as No. SS1263 and is identified as a "Salesmen's Sample Floater Policy." Defendant denied liability, claiming that the loss was covered by another policy known as No. TF4584, labeled a "Transportation Floater Policy," the obligations of which it had fully paid. Both policies were issued simultaneously November 22, 1941. No. 1263 was for a $5,000 coverage, the annual premium charged and paid being at the rate of four percent, or $200, while No. 4584 was for a total $8,000 coverage with an annual premium charge of two percent, or $160, but with a proviso limiting liability to $2,000 if the loss occurred at the Hart store. Other limitations were provided for stores in other towns where plaintiff had sales outlets.

Policy No. 1263 by its terms—

"covers the property insured within the limits of Continental United States and Canada while in the custody of any * * * transportation company," including "steamship or steamboat, and *on automobiles of Assured or their salesmen, and/or while in any hotel, dwelling and/or business building, except on the premises of the Assured or where their salesmen have permanent offices or permanent sales rooms* or where the Assured carries specific insurance," but "does not cover merchandise that may be sold and shipped by the Assured to others or purchased by the Assured from others." (Italics supplied.)

Policy No. 4584 provides for coverage:

"On goods and merchandise * * * held by them [the assured] in trust, or on commission, or on consignment, or on which they have made advances, or sold but not delivered." It covers merchandise "In transit only while on the premises of others for exhibition, trial, or approval and while in transit between such locations and

the premises of the assured" in St. Paul, plaintiff's home location, where he has his manufacturing establishment, but "does not insure against loss or damage" if, at the "time of loss or damage there is any other insurance which would attach if this insurance had not been effected, except that this insurance shall apply only as excess and in no event as contributing insurance and then only after all other insurance has been exhausted."

Hart was and for a long time had been an established outlet for the sale on commission of plaintiff's merchandise, shipped to and kept by it for sale as plaintiff's consignee.

The fire, which occurred in the late evening of December 31, 1941, wholly destroyed plaintiff's sample coats, including the merchandise held by Hart for sale on consignment. The loss on the consigned goods greatly exceeded the amount of coverage provided by policy No. 4584, which under its terms was limited to $2,000. Defendant's adjuster approved plaintiff's claim to the full extent of that policy but rejected the one under policy No. 1263. Defendant offered no testimony and rested at the close of plaintiff's case.

The findings are exhaustive, but we shall now try to summarize them. Mr. Ben B. Weed, a copartner of Weed, Parker & Company, represented defendant in negotiating and writing the policies. He was well acquainted with plaintiff's affairs and the manner and extent of his business activities, having written plaintiff's business insurance over a period of at least 15 years. Some time prior to November 22, 1941, Mr. Weed and plaintiff thoroughly discussed the nature, method of operation, and insurance requirements of plaintiff. Mr. Weed explained the types of policies which would give plaintiff the best and most complete protection and avoid certain difficulties he had experienced in the past with other policies. Mr. Weed knew of plaintiff's arrangement with Hart and the methods employed in handling goods sent to it. The so-called "Salesmen's Sample Floater Policy" was suggested as the one best suited to meet plaintiff's requirements where goods were not on sale and thus not covered by policy No. 4584, which Mr. Weed designated as the "consignment policy." Both policies were prepared

and executed by Mr. Weed on behalf of his agency and as defendant's authorized representative. His authority is not questioned.

Called as a witness for plaintiff, Mr. Weed testified that the plan and purpose of these two policies was to give plaintiff complete coverage for his merchandise while away from his St. Paul store; that the salesmen's samples at the Hart store were intended to be protected under policy No. 1263, and as such to be considered separately from the merchandise there on consignment and covered by No. 4584, the "consignment policy."

It was the custom of plaintiff and Hart to coöperate in conducting special sales during certain seasons of the year, when one of plaintiff's men would bring from the St. Paul store new samples for display. Accordingly, during the post-Christmas holiday season, such a sale was put on at Hart's store. These samples, which were identified by special tickets or tags bearing plaintiff's trade name only, namely, "Gershcow Company," were displayed on racks segregated from the consigned coats and were brought to Hart's primarily for advertising and exhibition purposes. Mr. Burt Orensteen, plaintiff's representative, testified:

"* * * we have sales there, I go up there once or twice a month during the time, if it is busy season twice a month; if not, once. During these sales they advertise I am coming, that the furrier is coming with his sample line; of the sample line, I carry from 50 to 75 coats of my own with me to make the stock much larger and give the customer a larger selection of merchandise. This sample line I carry with me is not commingled with the consignment merchandise for the store, the reason being, I am responsible for every coat I have with me in the store."

As stated, the samples carried only a tag showing plaintiff's trade name; they had no sale price tags. As to consigned garments, the price tags were attached to each garment. Hart's employes knew nothing of the prices to be charged for the sample coats. Only Orensteen knew these prices, and no sale of these coats could be made without his authority. Because of their segregation from the

consigned merchandise, they at all times remained plaintiff's property, in Orensteen's charge and at his risk as plaintiff's agent.

When the fire occurred, Orensteen had left for St. Paul, to be gone over the week end but intending to return promptly to St. Cloud, since the special sale was to continue the following week. He took with him to St. Paul a number of the sample coats but left some 16 of them for showing to customers who might be interested in their purchase.

There is no doubt that defendant would have been liable if the fire had occurred while Orensteen was in St. Cloud. But defendant makes much of the fact that it was Orensteen's custom to take back· to St. Paul all samples on such occasions as this. Even so, if during his absence a good prospect for a sale had materialized, Orensteen could have been reached by telephone at St. Paul almost as promptly as if he had been in St. Cloud. All that a Hart salesman needed to know was the price fixed by Orensteen. A sale could have been consummated under such circumstances as readily as if Orensteen had remained in St. Cloud.

■ The question, then, is whether the recited facts, which are well sustained by the record, support the court's conclusion that defendant is liable to plaintiff under policy No. 1263, the "Salesmen's Sample Floater Policy." We think they do. The language used by the insurer was its own, deliberately chosen by it. The words so used should "be given the usual and ordinary meaning that it conveys to the popular mind." 3 Dunnell, Supp. § 4659, note 97(a). While the provisions of an insurance contract should be "given a reasonable and practical construction not inconsistent with the clear language therein used," as far as permitted by that rule they "will be construed most favorably to the insured." *Id.* note 97(e). And, "when reasonably possible words in a policy must be so construed as to make effective the general insurance purpose." *Id.* note 97(b). Considering the two policies together, the "general insurance purpose" seems clear. Here, the salesman's samples were obviously in a class by themselves. They were so specifically named and designated in the policy. The mere fact that

the garments were not in the physical possession of Orensteen at the time of the fire is not controlling, since obviously they were under his control and at all times subject to his orders and directions. "A restrictive meaning will not be given even to an unambiguous phrase if by reference to the whole instrument such a construction would be unreasonable." *Id.* note 97 (*l*). And see, "The Need for Understanding," by President Walter C. Coffey of the University of Minnesota, in 43 Minnesota Alumnus (May 1944), p. 270, wherein he speaks of "language as a social instrument" used in the "communication of ideas." He defines it as "the device whereby we communicate with our fellow men," and says that "our success in living with them depends largely upon the skill with which we can make our thoughts and feelings apparent to each other."

■ Testing the facts recited by the requirements of our cases and applying Dr. Coffey's definition of "language," we think there can be no doubt that defendant's "Salesmen's Sample Floater Policy" was the instrument intended and specifically given to protect plaintiff's property against the hazard undertaken by defendant for an adequate consideration specified and collected by it.

The order is affirmed.