## EDWARD S. STRUBLE v. OCCIDENTAL LIFE INSURANCE COMPANY OF CALIFORNIA.

120 N. W. (2d) 609.

February 21, 1963—No. 38,687.

*Rollin J. Whitcomb,* for appellant.

*Mackall, Crounse, Moore, Helmey & Holmes* and *Val M. Higgins,* for respondent.

MURPHY, JUSTICE.

This is an appeal from a judgment in an action instituted by an in-

sured to collect benefits under an accident and health policy. The essential issue turns upon the interpretation to be given one provision in the policy which limits benefits to the period the insured is totally disabled and is "necessarily and continuously confined within the house and therein regularly visited and attended by a legally qualified physician or surgeon other than himself." The jury was instructed that it could find for the plaintiff only if he was substantially confined to his home during such a period. A verdict was returned for the plaintiff. The court thereafter granted the defendant's motion for judgment notwithstanding the verdict, being of the view that as a matter of law the evidence did not justify the finding that the plaintiff had been substantially confined to his home.

From the record it appears that the plaintiff was first employed by Forman Ford, a paint and glass manufacturer located in Minneapolis, in 1945 after honorable discharge from the Air Force where he had served as a bombardier and navigator on 30 missions in the Pacific area. He began work in the putty department, filling and labeling putty cans at a salary of $175 per month. In course of time he rose in the company until at the time of the issuance of the policy he had become contract manager for contract glass sales at a salary of $600 per month. His work involved discretion and considerable responsibility. The glass produced and installed by his employer was used in building construction. He was authorized to submit bids on contracts involving up to $15,000 without approval of a higher authority. He was required to follow through on bids submitted by him and meet with contractors to work out the specific details of construction projects. The success or failure of his employer in being awarded contracts was largely dependent upon the cooperation and assistance rendered by plaintiff to these contractors. Plaintiff also had under his direct supervision some four or five salesmen in addition to a crew of so-called "glaziers," up to perhaps 20 in all, depending upon the work required in a particular construction project.

In April 1955 the plaintiff became interested in taking out an insurance policy which would indemnify him in the event he became incapable of attending to these prescribed duties by reason of accident

or sickness. After seeing an advertisement in a newspaper he contacted a representative of the defendant, Occidental Life Insurance Company of California. This company issued to the plaintiff a cancelable accident and health policy on May 18, 1955, which provided, among other things, for a monthly indemnity of $200 for loss resulting from sickness contracted more than 14 days after the date of the policy. There was no evidence that prior to the issuance of the policy plaintiff had experienced any illness which would cause him to anticipate that he would suffer the disability he subsequently experienced.

Because of the nature of his illness, it is necessary to discuss in some detail the occurrences leading up to it and his subsequent conduct and activities. It appears from the record that the plaintiff became aware of a change in his health in the summer of 1957, approximately 2 years after issuance of the policy. This change manifested itself in his attitude toward the duties he was required to perform in his work. He found himself unable to face the challenges of his work and neglected calling on those people with whom contact was necessary. He found himself approaching the offices of contractors and, because of fear or indecision, failing to carry through with his calls. He would leave his work and sit on a park bench. He experienced continual fatigue and general moods of withdrawal and depression.

Because of these symptoms and their subsequent effect on his ability to discharge his daily job responsibility, he sought medical help. He first consulted one Dr. Clark at the Minneapolis Psychiatric Clinic. As a result of this call there followed a week-long confinement at Glenwood Hills Hospital in Golden Valley commencing July 9, 1957. The treatment at Glenwood Hills consisted of rest, medication, and psychiatric consultation. He was released on July 15 but readmitted and hospitalized for the period from August 11 to August 24, 1957, at which time he was under the care of Dr. Robert Jeub, a specialist in psychiatry and neurology. During this second confinement, several electric shock treatments were administered to him. These treatments are radical and are generally utilized only in the event of severe depression; among the reasons they were thought necessary in the plaintiff's treatment was the fact that he had thoughts

of self-destruction. Besides the confinements in July and August 1957, plaintiff was a patient at Glenwood Hills from October 1 to November 13, 1957, and for almost a week commencing January 13, 1959. On each of these occasions he received rest, medication, psychotherapy, and psychiatric consultation, and during the depths of his depressive periods approximately 20 electric shock treatments were administered. Dr. Jeub's diagnosis of plaintiff's ailment is that he has for a long time suffered from "chronic anxiety reaction and a chronic depressive reaction."

That plaintiff was unable to perform those responsibilities required in his job and therefore was totally disabled within the meaning of the policy provisions is not disputed.[1] The policy contains two indemnification provisions. Defendant fully admits its liability from the inception of plaintiff's illness on July 9, 1957, to the same date in 1959 under Part 7, § A, of the policy, which provides for 24 months' indemnity for total disability, but which does not require house confinement. The only question raised on this appeal relates solely to the interpretation to be given the provision of Part 7, § B, of the policy, which provides for unlimited liability of the insurer for the priod the insured is "so disabled and necessarily and continuously confined within the house and therein regularly visited and attended by a legally qualified physician or surgeon other than himself."[2]

---

[1]"Total disability" in an occupational disability policy, such as is involved herein, might be defined as an inability to perform to some substantial extent the material parts of the insured's business in the customary and usual manner and with substantial continuity. Weum v. Mutual Benefit Health & Acc. Assn. 237 Minn. 89, 102, 54 N. W. (2d) 20, 28; Blazek v. North American Life & Cas. Co. 251 Minn. 130, 135, note 2, 87 N. W. (2d) 36, 41, note 2.

[2]The contract so far as material here provides:

"Part 7. MONTHLY SICKNESS INDEMNITY

\*     \*     \*     \*     \*

"TOTAL DISABILITY AND CONFINEMENT

"B.  If such sickness shall continue beyond the period of twenty-four consecutive months specified in Section A of this Part and shall wholly, necessarily and continuously disable and prevent the Insured from performing each and every duty pertaining to his occupation, the Company shall

The facts relative to the confinement clause disclose that the plaintiff finally left the employ of Forman Ford in July 1959 and on the advice of his psychiatrist sought employment elsewhere. Between August 1959 and June 1960 he had worked successively but intermittently with two realtors, William F. Olsen & Son, Inc., from August 1959 to March 1960, earning a total of $500, and Parkway Realty from April to June 1960, earning about $600. In that period little progress was made towards plaintiff's rehabilitation. Consequently in the summer of 1960 Dr. Jeub, who had continued throughout as his attending physician, suggested another approach. Under this advice the plaintiff obtained employment as a general laborer for a building contractor from June until September 1960, during which period he earned approximately $950. It was Dr. Jeub's purpose in having plaintiff work outdoors to get him to use his hands, much as he had first done at Forman Ford when he commenced at the bottom and rose to a position of responsibility. These facts are evident from the uncontradicted testimony of Dr. Jeub who described the advantages he sought for plaintiff in suggesting such employment as follows:

"The reason I felt this, that here—here was a young man who had begun working in the Forman Ford Company at very varied different jobs, starting at the bottom and working his way gradually up the ladder. Since attempts at rehabilitation, occupational-wise, had been unsuccessful, it was my feeling that perhaps if he began in some type of construction business as a common laborer and worked for a period of time, this might give him the incentive to do a few more things and to gradually begin again to work his way up the ladder as he had done."

The plaintiff made apparent progress toward recovery that summer, apparently as a result of the construction work he had entered into as therapeutic employment, so that by fall he was ready to undertake work which would comprehend greater use of his mental faculties

continue to pay the monthly sickness indemnity for the period the Insured shall live and be so disabled and *necessarily and continuously confined within the house* and therein *regularly visited and attended by a legally qualified physician* or surgeon other than himself." (Italics supplied.)

and lead toward the restoration of his capacity to accept responsibilities. Accordingly, in September 1960 plaintiff left construction work and entered a management training program with White Way Cleaners, which program he completed in January 1961 and for which he was paid approximately $1,600. The opportunity to test the success of Dr. Jeub's rehabilitation program and whether plaintiff could accept responsibility without bringing on the symptoms of his mental illness came upon the completion of the training program when White Way assigned plaintiff to manage one of its establishments. Unfortunately for plaintiff, that responsibility only brought on a remanifestation of his illness, as a consequence of which he was unable to continue work after May 1961. No therapeutic treatment other than medication was attempted between May 1961, when the plaintiff left White Way, until October 1961, the time of trial. It appears that he earned about $2,000 at the last job.

The evidence further disclosed that since plaintiff's termination of his last employment in May 1961 he has painted his house, repaired the fence, and done other work around the premises both indoors and out. His social activities since that time have been limited to about two night football games, a couple of movies, and several tennis tourneys in 1960 but none at all in 1961. It also appears that sometime in 1961 the plaintiff was called for jury duty, but it does not appear that he actually served in the trial of a case. During the entire period, plaintiff continued under the care of Dr. Jeub. The extent of that care was described by Dr. Jeub:

"He has been taking antidepressants, some of the new drugs which have come on the market since 1957, 1958. He has been on various ones and on various combinations and various dosages. He has been seen by me an average of, oh, maybe once a week, since I first saw him in July of '57. He has been seen on the job, he has been seen at my home, I have had several telephone contacts with him, we have adjusted and readjusted medication at various periods of time since then."

We are thus faced with the problem of whether or not the confinement clause contained in Part 7, § B, of the policy operates to

bar recovery of benefits by the insured beyond the 24 months allowed under Part 7, § A, where the illness is such that, even though covered under the policy, it does not require confinement and where, if such clause is interpreted as being mandatory, it is both inconsistent with the medical advice of his physician and if complied with would tend to worsen rather than improve the insured's mental health.

It is not contended by the defendant that the plaintiff's illness is feigned or unreal or that the plaintiff's conduct has been that of a malingerer. It concedes:

"That the appellant has suffered a serious illness is not denied. That he has been prevented, by said illness, from performing his normal occupational pursuits is not denied * * *. That he has suffered a confining illness is categorically denied."

The defendant argues that the provision of the policy which conditions liability upon the insured's being necessarily and continuously confined within his house and regularly visited by a physician must be construed to give it the meaning it would ordinarily convey to the popular mind and that evidence of plaintiff's conduct and activities during the period in question fully establishes that liability under the particular facts here was never contemplated by the parties to the contract.

The construction and application of health and accident insurance policies which provide for the payment of specified benefits to an insured while disabled from working or pursuing his usual occupation is the subject of an extensive annotation in 29 A. L. R. (2d) 1408, in which innumerable authorities are gathered. The many decisions which have interpreted the "house confinement" clause involved in these cases do not fall within well-defined categories. The determinations turn upon variances of phraseology used in particular contracts, the particular fact situations to which they are applied, and the attitudes or judicial policies of the courts, which vary from constructions which are strictly literal to those which are liberal or broad. They range from the literal or narrow interpretation as found in MacFarlane v. Pacific Mutual Life Ins. Co. (7 Cir.) 192 F. (2d) 193, 29 A. L. R. (2d) 1403, where a polio patient who was able to leave

his home by use of artificial aids was denied recovery, to those decisions which consider the purpose of the clause as evidentiary, intended to prescribe the kind and character of evidence which would with greatest certainty establish the degree of incapacity or disability prerequisite to recovery. Duke v. General Acc. Fire & Life Assur. Corp. 212 N. C. 682, 194 S. E. 91; Lewis v. Liberty Industrial Life Ins. Co. 185 La. 589, 170 So. 4, 107 A. L. R. 286; Federal Surety Co. v. Waite (Tex. Civ. App.) 297 S. W. 312; Rocci v. Massachusetts Acc. Co. 222 Mass. 336, 110 N. E. 972, Ann. Cas. 1918C, 529. Moreover, it further appears that some courts have adopted the view that the confinement clause is inserted to prevent fraud or at least to discourage malingering, because it is recognized that the requirement of indefinite confinement under the care of a physician would quickly discourage a pretended illness or disability. Mutual Benefit Health & Acc. Assn. v. Milder, 152 Neb. 519, 41 N. W. (2d) 780.

This is the first case where we have been called upon to examine the so-called "house confinement" clause. The policy of this court with reference to the construction of insurance contracts for health and sickness benefits is best reflected in those decisions wherein we have construed health and accident insurance policies against "total loss" of time because of illness or those policies which indemnify against injuries which "wholly and continuously" disable the insured. In Lobdill v. Laboring Men's Mutual Aid Assn. 69 Minn. 14, 71 N. W. 696, 38 L. R. A. 537, we aligned ourselves with those authorities which have rejected the literal approach in the construction of insurance policies[3] which provide for compensation in the event of total disability. The policy in the Lobdill case insured one who was a merchant by occupation from loss by bodily injuries "wholly and continuously disabling" the insured from transacting any and every kind of business pertaining to his occupation. We there held that the fact that the insured occasionally performed some act connected with his business as a merchant would not necessarily prove that he was not

---

[3]See, also, Carson v. New York Life Ins. Co. 162 Minn. 458, 462, 203 N. W. 209, 211.

totally disabled within the meaning of the policy and pointed out that the nature and frequency of such acts would ordinarily be for the consideration of the jury in determining the issue of total disability. In that case Mr. Justice Mitchell went on to observe (69 Minn. 16, 71 N. W. 696, 38 L. R. A. 539):

"Total disability must, from the necessity of the case, be a relative matter, and must depend largely upon the occupation and employment in which the party insured is engaged."

The decisions which followed the Lobdill case are reviewed in Weum v. Mutual Benefit Health & Acc. Assn. 237 Minn. 89, 54 N. W. (2d) 20, which is a helpful authority because it expresses the principles of law this court has followed in the construction of health and accident insurance policies. In the Weum case we had before us a health and accident insurance policy taken out by a physician which covered injuries which would "wholly and continuously disable the Insured * * * so long as the Insured lives and suffers said total loss of time." The insured sustained a permanent injury which impaired his ability to carry on his particular speciality, which was that of an obstetrician. He thereafter became associated with another physician, who took care of his practice. In due time, when plaintiff had recuperated sufficiently and returned to his practice, he was able to perform some of the duties of his profession. While he could not perform deliveries or Caesarean operations, there was evidence that he did consult with patients and prescribe for them. He was present and assisted in surgical work performed by his associate. In that case the jury was instructed that (237 Minn. 98, 54 N. W. [2d] 26):

"* * * the phrase 'wholly and continuously disabled so long as the insured lives and total loss of time continues' does not mean that the plaintiff was required to be utterly helpless or absolutely dependent in order to sustain a recovery in this action. It is enough that he be unable to perform the substantial and material acts necessary to the successful prosecution of his occupation or employment in the customary and usual way."

We held that the record supported the verdict for the plaintiff and noted that, although the plaintiff was found to be unable to perform the substantial and material acts of his specialty (237 Minn. 110, 54 N. W. [2d] 32), "the fact that he had, on the face of statistics, a substantial income [from his medical practice] would not bar a recovery under considerations which we have set out." We further said (237 Minn. 104, 54 N. W. [2d] 29):

"* * * The insurers must concede that the terms cannot be given their literal meaning of complete helplessness. Some limitation upon the literal terms is obviously necessary in order to give a realistic meaning to the words and give to the insured some measure of the protection which he bargained and paid for. This court has not hesitated to supply such a limitation to the literal meaning. * * *

"Where clarification of the literal meaning of the terms of the contract is necessary but the nature of the limitation is not stated in apt words in the policy, this court * * * must decide what the intention of the parties is as to the extent of the limitation of the literal meaning of the words. The literal meaning of the policy terms must be limited to some extent. The extent of the limitation does not appear in the policy."

It is unnecessary to review the many authorities which discuss criteria for the construction and interpretation of insurance contracts. It is sufficient to say that such contracts must be liberally construed in favor of the insured so as not to defeat without a plain necessity his claim for the indemnity which, in the making of the insurance contract, it was his object to secure. The rule which has influenced our court, and by which we must be guided here, is that in the interpretation of limiting conditions in insurance policies, when reasonably possible, words must be so construed as to make effective the general insurance purpose of the contract. In the Weum case we said (237 Minn. 105, 54 N. W. [2d] 29), "In resolving doubts as to the meaning to be given the terms of an insurance contract, this court will note the purposes for seeking insurance and will avoid an interpretation which would forfeit rights which the insured may have believed he was securing, * * * ." Moreover, words may well be construed contrary to their

literal meaning in order to carry out the general object of the insuring agreement. Bolduc v. New York Fire Ins. Co. 244 Minn. 192, 69 N. W. (2d) 660; Motor Vehicle Cas. Co. v. Smith, 247 Minn. 151, 76 N. W. (2d) 486; Gershcow v. Homeland Ins. Co. 217 Minn. 568, 15 N. W. (2d) 88; Garbush v. Order of United Commercial Travelers, 178 Minn. 535, 228 N. W. 148; Anderson v. Connecticut Fire Ins. Co. 231 Minn. 469, 43 N. W. (2d) 807.

Nor is it necessary to again expand upon the principle of construction stated in most of the authorities already cited to the effect that a contract of insurance is to be construed liberally in favor of the insured and strictly as against the insurer. Where the provisions of a contract are susceptible of two interpretations, one favorable to the insured and the other favorable to the insurer, the former will be adopted.

With these principles in mind, attention must be directed to a conflict in the provisions of Part 7, § B, of the policy itself. Whereas the policy provides on the one hand that the plaintiff, in order to be eligible for benefit payments, must be "necessarily and continuously confined within the house," it also requires that he be "regularly visited and attended by a legally qualified physician." The latter clause serves to evidence the insured's actual disability and, as is perhaps more important, to assure his speedy recovery under the care of his physician so as to terminate as quickly as possible the liability of the insurer. Moreover, it should be assumed that the parties had in mind that the insured would follow the advice of his physician. In the case before us the physician advised the insured to get out as much as possible solely for therapeutic purposes.

It is apparent here that the terms of the policy are not so clear that they may be applied without judicial construction and interpretation of their meaning. Some limitation upon the literal terms is obviously necessary in order to give a realistic meaning to the words and provide some measure of the protection for which he bargained and paid. The insured here sought to secure a certain level of income protection in the event of a disabling accident or illness which would prevent him from carrying on as a contract sales manager at Forman

Ford. It is important to keep in mind that the insurance contract before us is an "occupational" disability policy, which we have held is designed to protect the insured from disablement as to his specific employment.[4] Not only was the policy issued to protect against occupational disability, but it also purported to insure against disability due to mental illness.

It seems to us that where, on the facts presented in this case, the evidence contradicts the possibility of fraud or malingering, and the insured, who in good-faith compliance with a mandatory provision of one clause in following the advice of his physician, necessarily acts counter to the express mandate of another clause requiring confinement, the purpose of which is designed to prevent fraud or malingering, then compliance with such confinement clause is conditional upon its consistence with the over-all purpose of the policy read as a whole and the clause requiring the care of a physician in particular. Obviously, on the facts before us it would be contrary to the best interests of both insured and insurer for plaintiff to comply with the mandate of the confinement clause, as such compliance could only tend to worsen his condition and extend defendant's liability.[5]

The defendant relies on Mutual Health & Acc. Assn. v. Milder, 152 Neb. 519, 41 N. W. (2d) 780, which also involved a health

---

[4]Lobdill v. Laboring Men's Mutual Aid Assn. 69 Minn. 14, 71 N. W. 696, 38 L. R. A. 537, recently followed in Blazek v. North American Life & Cas. Co. 251 Minn. 130, 87 N. W. (2d) 36; Weum v. Mutual Benefit Health & Acc. Assn. 237 Minn. 89, 54 N. W. (2d) 20.

[5]In Glenn v. Gate City Life Ins. Co. 220 N. C. 672, 675, 18 S. E. (2d) 113, 115, in allowing an insured disabled by blindness to recover under the policy, it was said:

"The purpose of the provision relative to the insured's being confined to his bed or house was to describe the character and extent of his illness, rather than to prescribe a limitation upon his conduct. To give the provision relative to the insured's confinement * * * the construction urged by the defendant would be to so magnify the letter as to practically nullify the principal object of the policies."

See, also, Mutual Benefit Health & Acc. Assn. v. Burrow's Executrix, 257 Ky. 808, 79 S. W. (2d) 222; Newton v. National Life Ins. Co. 161 La. 357, 108 So. 769.

and accident insurance policy and the interpretation of a house confinement clause. Recovery by the insured under that clause was denied. There are significant factual variances between the Milder case and the one before us. The Milder case was originated by the insurer to have the policy rescinded on the ground of fraud and misrepresentation of the insured upon his application. On the issue of the defendant's confinement under the care of a physician, there were strong undercurrents of possible fraud throughout the case. There were the many trips taken by the defendant as far as California, New York, and Florida since his alleged disablement in 1942 and no evidence to support a finding that such trips were for his health or made on the advice of his physician, or even that they were of any therapeutic value. Periods of from 3 to 6 months elapsed between infrequent visits to his physician. There was little difference in the activities of the defendant, who was over 54 years of age at the time of trial, and any other person who might have retired at that age. Moreover, the policy did not insure against loss of occupation. We agree with the statement in the Milder case (152 Neb. 545, 41 N. W. [2d] 794), "Each case [involving accident and health policy providing total disability benefits] depends largely on its particular facts and the language of the contract."

We accordingly conclude that, under the particular contract before us as applied to the facts of this case, the character and extent of the plaintiff's illness must control over those provisions of the policy which limit the activity of the insured.

Reversed with order to enter judgment for plaintiff in accordance with the verdict of the jury.

ROGOSHESKE, JUSTICE (concurring specially).

I agree with the majority's construction of the questioned clause to the effect that plaintiff's compliance with that cause does not preclude any departure from the home if such departure is for medical and therapeutic reasons under the advice of the attending physician.

However, I disagree that this construction supports a reinstatement of the jury verdict for plaintiff. There remains the question of whether the departures established by the evidence were in fact medi-

cal requirements. This is a question of fact to be decided by the jury unless the evidence, and all reasonable inferences therefrom as viewed most favorably to the defendant, established that every departure and all attendant conduct of the plaintiff beyond the confines of the home were therapeutically required.

The posttrial decision of the trial court does not make clear to me whether this fact issue was determined by application of the rule of "literal" construction or the rule of "broad" construction which we agree is the better rule. The order granting judgment notwithstanding the verdict could have been made because the trial court required a literal compliance with the questioned clause as urged by the dissent even though it is declared to be based upon a nonsubstantial compliance as a matter of law.

In any event, even though neither argued nor urged by the parties, justice would seem to require a new trial so that the issue of fact could be resubmitted in the light of our construction; and if the reasons for the admitted departures are disputed—as I believe the record indicates—, the issue should be submitted to the jury under appropriate instructions emphasizing not "substantial compliance" but the reasons for the admitted departures.

OTIS, JUSTICE (dissenting).

I agree with the conclusions of the trial court, stated in his memorandum thus:

"As indicated above, there is little or no dispute as to the actual facts. * * * It seems sufficient that there was little actual confinement. Plaintiff left his home for many reasons. During most of the critical period he was employed and he left his home for his work. He left his home for recreation, vacations, shopping and other purposes, much as any person might do. That some of these activities may have been with the advice and consent of his physician does not alter the fact that he was not substantially confined to his home."

"The fallacy of this argument of plaintiff [that there was substantial confinement] is that it eliminates as practically meaningless a substantial provision in the contract of the parties."

The majority opinion simply truncates unceremoniously all that part of the contract which specifies the duration of coverage. Part 7, § A, of the policy provides:

"TOTAL DISABILITY AND NON-CONFINEMENT

"A. If such sickness shall wholly, necessarily and continuously disable and prevent the Insured from performing each and every duty pertaining to his occupation, the Company shall pay the monthly sickness indemnity for the period, *not exceeding twenty-four consecutive months,* the Insured shall be so disabled and necessarily under the regular care and attendance of a legally qualified physician or surgeon other than himself." (Italics supplied.)

Although the policy expressly limits coverage to 24 months unless the insured is "necessarily and continuously confined within the house," we now hold that the quoted language is to be read out of the contract entirely. As a result, plaintiff has paid for an ordinary 24-month total disability policy and has received one which is apparently good for life.

I concur in the well-expressed views of the Nebraska court in Mutual Benefit Health & Acc. Assn. v. Milder, 152 Neb. 519, 546, 41 N. W. (2d) 780, 795, which construed a similar policy and rejected the position here taken by the majority:

"A health and accident insurance company may limit its liability in any reasonable manner. The provisions of the policy involved in this case recognize that hazard in health insurance is greater than in accident insurance. Ordinary knowledge and experience support that view. The symptoms of disease are frequently only subjective, while in cases of accident the evidence is more commonly objective. The terms of the policy also recognize that with unguarded health policies, slight illness might tempt an insured to seek relaxation from ordinary labor or activity at the maximum expense of an insurer. If, however, the claimant in order to enjoy the fruits of his simulations must be confined continuously within doors and have regular visits therein by a physician, he will quickly grow weary of them. It is to discourage doubtful claims of total disability from illness or the pro-

traction of illness for the purpose of securing maximum benefits of insurance contracts that insurers condition full indemnity to confinement indoors accompanied by regular medical attendance. This is the character of the contract under which appellee claims. It does not unreasonably limit liability, and no principle of public policy is thereby contravened. * * *

"A construction of the contract sufficiently liberal to comprehend maximum recovery by appellee is urged. It is a sound principle of law that doubt and ambiguity in an insurance contract should be resolved in favor of the insured. Frequent decisions of this court affirm this rule, but this doctrine does not mean that a clear provision of the contract is to be ignored or words stretched to include gratuities. The language from another decision quoted with approval in Stone v. Physicians Casualty Assn. *supra*, clearly states this [130 Neb. 769, 773, 266 N. W. 605, 607]: 'It does not follow, however, that the terms of an insurance policy may be distorted from their natural meaning, or that the agreed liability of the insurer should be enlarged into one which only a new contract could have imposed, nor, indeed, that a court should indulge in scholastic subtleties to extend the rights of the insured. * * * Courts should not be "cunning and astute to evade, rather than quick to perceive and diligent to apply, the meaning of the words," as manifestly intended by the parties.' "

I would affirm.

MR. JUSTICE SHERAN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.