146 N.W.2d 358 (1966)
William A. BENSON, Jr., Spec. Admr. of Estate of William A. Benson, Respondent-Appellant,
v.
CONTINENTAL CASUALTY COMPANY, Appellant-Respondent.
Nos. 39733, 39802.
Supreme Court of Minnesota.
July 29, 1966.
On Rehearing December 2, 1966.
Danforth & Allen, Minneapolis, for Continental Cas. Co.
Grant W. Anderson, Minneapolis, for respondent.

OPINION
FRANK T. GALLAGHER, C.
This matter involves two consolidated appeals. Defendant, Continental Casualty Company, appeals from a judgment against it for $5,367.50. Plaintiff, William A. Benson, *359 Jr., special administrator of the estate of William A. Benson (the insured), appeals from that portion of the judgment which denies him, as administrator, the right to recover monthly indemnity payments of $150 each for the loss of time due to sickness of the deceased from December 1, 1960, to September 23, 1961, inclusive.
The company contends on appeal that the administrator's cross-appeal was not timely taken and that therefore the issues raised therein are not reviewable. In view of the fact that each party presented its case on the merits on oral argument before this court, we shall consider the case on that basis.
On December 24, 1921, the company issued its cancelable policy to the insured, which policy provided among other things sickness indemnity benefits for house confining and nonconfining sicknesses as defined in the policy. Part V, paragraph A, of the policy provides:
"Confining Sickness. The Company will pay said Sickness Indemnity for the period during which the Insured shall be necessarily and continuously confined within the house solely by reason of sickness and throughout which he is therein regularly visited by a legally qualified physician."
A rider attached to the policy, bearing the same date, provided in part that the policy limitation upon the length of time for which indemnity would be paid in the event of total disability and confinement to the house by reason of sickness was extended to 3 years.
Under Part V, paragraph C, the nonconfining sickness provision, the company agreed to pay the insured sickness indemnity for such period (not exceeding one month) as the insured, by reason of nonconfining sickness other than specified in paragraph B or by reason of convalescence from a confining sickness, was prevented from performing any duty pertaining to his occupation and throughout which he was regularly attended by a legally qualified physician although not confined within the house. Under that provision the total amount of indemnity the company agreed to pay was $150.
The policy, under its provisions, was to terminate on the insured's 60th birthday, which was on September 3, 1956. Any premiums received thereafter and accepted by the company were to be returned upon request.
It appears that during the effective time of coverage, the insured made timely premium payments and received benefits on at least two claims he filed with the company in 1951 and 1955. Although the policy was not to cover him after his 60th birthday, insured continued, through a mutual mistake, to make premium payments thereafter and the company continued to accept such payments through December 1961, some 5 years after the insured reached age 60. In March 1962, he tendered a check to the company which was rejected, and his policy was canceled. The December 1961 payment was the last one made. Both parties appear to agree that the policy lapsed or terminated on or about March 24, 1962, for failure to pay the premium thereunder unless on or before that date the insured was entitled to benefits under the house confinement clause of the policy.
On September 19, 1961, the company acknowledged to the insured a notice of a claim under the policy and enclosed a preliminary form to be immediately completed by him and his attendant physician. Subsequently, claim forms were sent the insured by the company or its agents notifying him that in order to consider his claim it must have claim forms completed by him and his physician. After some further correspondence, the company wrote the insured on February 27, 1962, stating that the reports submitted to it indicated that the insured had not been continuously confined or under the regular care and attendance of a physician; also that his policy specifically *360 stated that coverage was not to continue past age 60. The letter admitted that both the insured and the company apparently had overlooked that point, and although the company claimed no liability, it proposed to pay the insured $150, which represented the maximum due for one month's disability based on nonconfinement. It enclosed a release form for the insured's signature and requested a return of his policy. After some further correspondence between the company and the insured, suit was brought against the company about December 1962, alleging that since December 1, 1960, the insured had been confined to his home due to sickness and was therefore entitled to monthly payments of $150 under the policy. The insured died on February 24, 1964.
The action was tried before the court without a jury. The court denied the administrator benefits from December 1, 1960, to September 9, 1961, but allowed recovery commencing September 9 and continuing to the date of death of the insured, which the court computed as being 30 months at $150 a month, totaling $4,500 plus interest and costs. The company moved for amended findings or a new trial, which motion was denied. The company appeals from the judgment entered, and the administrator appeals from that portion of the judgment which denied him monthly indemnity payments of $150 each from December 1, 1960, to September 23, 1961.
The legal issues raised by the company are: (1) Under the facts in evidence here, was the insured "house confined" under the house confinement clause of the policy so as to entitle him to benefits? (2) Was the company as a matter of law entitled to judgment in its favor under the house confinement clause when, it claims, the uncontroverted facts show a total lack of house confinement?
The issue raised on the administrator's cross-appeal is: Where it was not reasonably possible to give notice to the company within 10 days as provided in the policy or 20 days as provided in the statutory form of policy (Minn.St. 62.0025, subd. 2) but notice was given as soon thereafter as reasonably possible, should an exception be made to the rule that disability payments are to be made only from the date of notice and the payments be made from the inception of the disability and confinement? He contends that the judgment should be for 36 months' indemnity payments for the period commencing December 1, 1960, the date the insured was placed on sick leave and confined to his house.
The administrator contends that the only questions in dispute are essentially questions of fact. He argues that the law in this state as applied by our court is that a house confinement clause in a health insurance policy should be liberally construed so as to give effect to the insured's purpose and intent when purchasing the contract, and that a health or disability policy containing a confinement clause covers an insured who is substantially or materially confined to his home. He contends that it is not necessary that the insured be bedridden, completely helpless, or continuously confined to his home and unable to move about, to meet the condition of confinement. The company claims, however, that the insured was not house confined within the clear meaning of the policy and that the judgment for the administrator is not justified by the evidence and is contrary to law.
It appears from the record that the insured had been living in retirement in Minneapolis at the time of death. He had been an employee of the Northwestern National Bank of that city for 48 years before reaching his compulsory retirement age of 65 on September 3, 1961. His last position at the bank was that of manager of its North American office, a position which he held until he began a leave of absence from the bank on December 1, 1960. He continued on his leave of absence until his retirement September 3, 1961.
The administrator testified that until May or June 1959 his father, the insured, appeared to be in very good health; that he *361 had not noticed anything wrong with him; that he was "quite a tall, strong, big man" with a "good mind"; and that about that time he began to notice symptoms which the insured was developing. On July 8, 1959, he took him to see Dr. John N. Giebenhain, whose examination disclosed considerable slurring of speech, a weakness of facial muscles on the right side, mild choking of both optic discs, and evidence of hyperactive reflexes. He referred him to the Mayo Clinic for further diagnostic studies.
The trial court found that the insured was given a physical and neurological examination at the clinic on July 13 and 14, 1959, by Drs. Kendall B. Corbin and A. E. Brown, who determined that he was suffering from a moderate degree of hypertension and a possible degenerative central nervous system disease; that subsequent examinations in November 1960 and June and December 1961 revealed gradual worsening of his condition, and in the opinion of Dr. Corbin, the insured was totally and permanently disabled in November 1960 with a diffused degenerative brain disease for which there was no cure; that the diagnosis of Dr. James Myhre, a specialist in internal medicine who examined the insured at Dr. Giebenhain's request, disclosed that he suffered a stroke prior to April 3, 1962, and was suffering from cerebral arteriosclerosis and coronary heart disease; and that in late November 1960, subsequent to receiving a letter from Dr. Corbin of the clinic, certain officers of the bank met with the insured, relieved him of his duties, and granted him a leave of absence to September 30, 1961, thereby permitting him to qualify under the bank's mandatory retirement plan for those attaining age 65. According to the findings, the insured had become permanently disabled and unable to perform the duties of his occupation by December 1, 1960, and such disability continued without interruption until his death February 24, 1964. No evidence was submitted by the company challenging the findings of the insured's doctors that he was totally and permanently disabled from December 1, 1960.
The court also found that about September 19, 1961, the insured gave the company written notice of his illness and subsequently gave it proof of loss; that such notice though not given within 10 days after commencement of disability was given as soon as was reasonably possible under the circumstances, with no resulting harm to the company or unfair advantage gained by the insured; and that it reasonably complied with the provisions of the policy because the insured never knew the extent, nature, or severity of his illness.
With reference to the insured's activities from about December 1, 1960, to April 1963, the court found that the insured was up and about, took walks, attended some meetings, voted, took annual winter trips with his wife, took a motor trip to Mackinac Island in August 1962 with his wife and other relatives, and visited on occasions at the houses of relatives and friends, but that such activities on his part were limited and generally with the assistance of relatives and friends; that no attempt was made by his three doctors to keep him in bed or confined to his house, but, to the contrary, his family was advised by them to permit the insured to live as nearly a normal life as he could under the circumstances because nothing could be done to cure or retard the progression of the disease and inactivity might accelerate such progression; and that because of the doctors' advice the insured's family did not compel his confinement to his house as they otherwise might reasonably have done because of his serious illness.
The court also found that, following another stroke, the insured was confined in Minneapolis hospitals from April 7 until about May 22, 1963, and from that time until his death spent most of his time in his house and confined to his bed; that during the entire period of his total disability he was under the care of Dr. Giebenhain in consultation with three other doctors and, *362 though their visits were not on a regular schedule or frequent basis, he was regularly visited by legally qualified doctors within the meaning of the policy; that because of his total disability beginning in December 1960, he was confined to his house by reason of sickness within the meaning of the policy; that the policy was in full force and effect from its inception to the date of his death; and that the attempted cancellation of the policy by the company in February and March 1962 was ineffectual.
The company pleaded numerous defenses, but its brief emphasizes only that the insured was not confined to his house. Accordingly, the administrator limited his brief to substantially that issue. The administrator contends that the company does not deny that the insured became sick and disabled in the early part of 1959 and that it admits that the insured was incurably sick when it states in its brief:
"* * * Mr. Benson's illness was incurable and no therapy could retard his gradual physical and mental deterioration."
He also argues that the company does not deny that on or about December 1, 1960, because of his disability, the insured was relieved of all duties at the bank and put on leave of absence and never was able to return to work.
The important question for the purpose of this opinion is whether the insured was necessarily and continuously confined within his house solely by reason of sickness and regularly visited there during that time by a legally qualified physician within the meaning of the policy, or whether he was covered for only one month under the nonconfining sickness clause of the policy. The administrator claims the record fully justifies the trial court's finding that after December 1, 1960, the extent of the insured's activity was limited and he was confined to his house within the meaning of the policy. He cites Struble v. Occidental Life Ins. Co., 265 Minn. 26, 120 N.W.2d 609, as controlling. The company contends that the insured was not house confined within the holding of Struble. The house confining clause in Struble is substantially the same as here except that in this case the confinement must be "solely by reason of sickness."
We do not consider Struble controlling under the facts and circumstances here. In Struble, it was undisputed that the plaintiff was unable to perform the responsibilities of his job and was totally disabled within the meaning of his policy, which contained two indemnification provisions. Defendant insurance company admitted its liability from the inception of plaintiff's illness on July 9, 1957, to July 9, 1959, under Part 7, § A, of that policy, which provided for 24 months' indemnity for total disability but did not require house confinement. The only question raised on appeal in Struble related to the interpretation to be given the provision of Part 7, § B, of the policy, which provided for unlimited liability of the insurer for the period the insured was "so disabled and necessarily confined within the house and therein regularly visited and attended by a legally qualified physician or surgeon other than himself." 265 Minn. 29, 120 N.W.2d 612.
The facts relative to the confinement clause in that case disclosed that the plaintiff found himself unable to perform the duties of his employment with a paint and glass company and in July 1959, on the advice of his doctor, a specialist in psychiatry and neurology, sought employment elsewhere. Between August 1959 and May 1961, he worked intermittently at various jobs in his rehabilitation effort, including selling real estate, general labor for a building contractor, and managing a dry-cleaning branch, during all of which time he continued under the care of his psychiatrist. The latter said that he had seen his patient about once a week and that plaintiff had been taking antidepressants in various combinations and dosages.
*363 We said in Struble (265 Minn. 37, 120 N.W.2d 616):
"* * * [W]here * * * the evidence contradicts the possibility of fraud or malingering, and the insured, who in good-faith compliance with a mandatory provision of one clause in following the advice of his physician, necessarily acts counter to the express mandate of another clause requiring confinement, the purpose of which is designed to prevent fraud or malingering, then compliance with such confinement clause is conditional upon its consistence with the overall purpose of the policy read as a whole and the clause requiring the care of a physician in particular. Obviously, on the facts before us it would be contrary to the best interests of both insured and insurer for plaintiff to comply with the mandate of the confinement clause, as such compliance could only tend to worsen his condition and extend defendant's liability."
We shall not attempt to set out in detail the differences between the policies in Struble and in this case except to say that in our opinion the coverage provided or intended in this case was less than in Struble. In this policy the house confinement limitation was limited to 36 months, whereas in Struble, under certain conditions, the coverage could have continued during the lifetime of the insured. Here, the nonconfining sickness period was limited to one month and was payable only if for that month the insured was prevented from performing any kind of labor pertaining to his occupation. In Struble, the insured was under the regular care of his doctor during all of the time involved and was following his advice in connection with his outside activities for therapeutic reasons. We do not find here a comparable situation. When the regular doctor was questioned as to whether he had made any recommendations that the insured should be confined within his house, he replied that "[h]e was advised to live as normal a life as possible." Dr. Myhre said that he had addressed most of his recommendations to the insured's wife (who "mostly took care of him") and that he had encouraged both of them to have the insured do as much as he was capable of doing, such as walking. He examined the patient in January 1963, and when questioned by him as to whether it would be all right to make a trip to San Diego, the doctor notified his patient that he "thought it was a good idea * * * so [he] encouraged him to go on this trip," but did not prescribe it. Dr. Corbin was not consulted by the insured about taking any trips but said it was his feeling that in the insured's condition he "is going to be happier if he participates in the routine family activities." No attempt appears to have been made by his three doctors to keep the insured in bed or confined in his house.
The insured suffered a stroke while in California and was returned to Minneapolis, where he was confined in hospitals from about April 7 to May 22, 1963. The court found that from then until his death, the insured spent most of his time in his house and confined to his bed.
We cannot agree under the record here with the trial court's finding that during the entire period of his disability from December 1, 1960, to the time of his death February 24, 1964, the insured was confined to his house by reason of sickness within the meaning of the policy. At most, it would appear that the only time he was confined to his house within the meaning of the policy was when he returned to his home after leaving the hospital about May 22, 1963, until his death on February 24, 1964. It is our opinion that the insured did not come under the provisions of Part V, paragraph A, of the policy pertaining to confining sickness, but instead he was covered under the nonconfining sickness clause, Part V, paragraph C, and his recovery is limited to the $150 payable for a nonconfining sickness.
*364 In arriving at this conclusion, we are mindful of the rule set out in Struble that a contract of insurance is to be construed liberally in favor of the insured and strictly against the insurer. We do not consider that rule, however, to mean that a clear provision of the insurance contract is to be ignored so as to make a liberal construction a generous or a gratuitous construction. In other words, the terms of the policy should not be distorted from their natural meaning and the agreed liability of the insurer should not be enlarged into one which only a new contract could have imposed. Stone v. Physicians Cas. Ass'n, 130 Neb. 769, 266 N.W. 605.
While we feel that a liberal construction was given the contract in extending the time for the insured to notify the company from December 1960, when he was found to be totally disabled, to September 1961 in spite of the policy's provision for a 10-day notice, we are not questioning that finding under the facts and circumstances here.
Reversed and remanded with instructions that judgment be entered for the plaintiff in the sum of $150, as provided for under the nonconfining provisions of Part V, paragraph C, with interest and costs.

OPINION
PER CURIAM.
We granted a rehearing on this case. We have reheard it and abide by our original decision.