WILLIAM G. WOLFF, Plaintiff and Respondent, v. STAND-
ARD LIFE & ACCIDENT INSURANCE COMPANY, an
Oklahoma Corporation, Defendant and Appellant.

No. 10993.
Submitted April 5, 1966. Decided May 3, 1966.
Rehearing denied June 1, 1966.
416 P.2d 11.

Lamey, Crowley, Kilbourne, Haughey & Hanson, Gareld F. Krieg (argued), Billings, for appellant.

Sandall, Moses & Cavan, John J. Cavan, Jr. (argued), Billings, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment upon a verdict for plaintiff awarding disability benefits under three disability policies owned by plaintiff.

The plaintiff was injured in an automobile accident on January 14, 1960. At that time he was insured under three accident policies which had been assumed by the defendant, two from Automobile Owners Association Insurance Co. and one from Peerless Life Insurance Co. The three policies each contain similar provisions.

Efforts to characterize parts of the policies as "bold type" or "small print" cause us to reproduce pertinent page one of Plaintiff's exhibit No. 3, the policy of the Peerless Life Insurance Company. Except for the color of the ink, its reproduction speaks for itself. The warning, "THIS IS A LIMITED POLICY READ IT CAREFULLY" is in red ink, the color of the "border design."

**AUTOMOBILE OWNER'S ACCIDENT and HOSPITAL POLICY**

This policy provides indemnity for loss of life or time and hospitalization from accidental bodily injury, as the result of accidents while driving or riding within any automobile, truck or bus, as herein limited and provided, and is Non-Cancellable and Guaranteed Renewable to the age of 80 years.

# PEERLESS LIFE INSURANCE COMPANY

Chicago, Illinois

(HEREINAFTER CALLED THE COMPANY)

| Accidental Death Indemnity $2,500.00 | Hospital Expense Maximum $500.00 | Monthly Accident Benefits $150.00 |
|---|---|---|

*Does Hereby Insure*    The date of issue... NOVEMBER 19, 1959.

......... WILLIAM G. WOLFF ......... (Hereinafter called the Insured)

whose beneficiary is ...... BERTHA J. WOLFF ......... who is the ..... WIFE
.....................................................................................Relationship

of the Insured. This policy is issued for a period of six months, or for one full year from its date of issue, and may be renewed for such further periods as the renewal premiums paid by the Insured in advance will maintain the policy in force, provided, however, that renewal of the policy for any period commencing after the Insured attains the age of 80 years shall be at the option of the Company only. All periods of insurance hereunder shall begin and end at 12:00 o'clock noon, standard time, at the place where the Insured resides and on date of issue.

## THE INSURING CLAUSE

This policy insures against loss, as herein limited and provided, from accidental bodily injury sustained while driving or riding within any automobile, truck or bus for business or pleasure during the term of this policy, provided such bodily injuries are caused solely by reason of an automobile, truck or bus accident.

### PAYMENT FOR LOSS OF LIFE

Part One

If the Insured shall sustain "Such Injury" as described in the Insuring Clause and not hereinafter excepted, which shall directly and independently of all other causes result in death within sixty (60) days from the date of accident, the Company will pay the sum of Two Thousand Five Hundred Dollars ($2,500.00).

### TOTAL CONFINEMENT BENEFITS FOR LIFE—AUTOMOBILE ACCIDENTS

Part Two

If "Such Injury" as described in the Insuring Clause, and not hereinafter excepted or for which indemnity is provided in Part One, shall immediately after accident wholly and continuously disable and prevent the Insured from performing any and every duty pertaining to any business or occupation, and as the result thereof is thereby confined within doors and requires regular visits therein by a legally licensed Medical or Osteopathic physician or surgeon, the Company will pay for any one accident an indemnity for one day or more at the rate of One Hundred Fifty Dollars ($150.00) per month, payments to be made periodically at weekly intervals: such weekly indemnity to be computed at one fourth of the monthly indemnity with payments to continue even for life, so long as such disability and confinement continues.

Form No CP–9-1-59

PLAINTIFF'S EXHIBIT 58408 3

The pertinent "confinement clauses" in the other two policies are the same except that the word "necessarily" appears before the words "confined within doors." Thus, we are looking to the insuring clause and Part II. We will revert to these clauses later.

Plaintiff, in the automobile accident referred to above, sustained a fracture of the right acetabulum. From January 14, 1960 until February 17, 1960, he was hospitalized. On February 17, 1960, he was released on crutches. Medical benefits were paid under the policies. Likewise confinement benefits were paid until February 17, 1960. No benefits were paid subsequent to February 17, 1960. The defendant Insurance Company contends that plaintiff was not entitled to further benefits because (1) he was not wholly disabled from performing any and every duty pertaining to any business or occupation; (2) he was not necessarily confined within doors or confined at all; and (3) he did not require regular visits within doors by a physician or surgeon.

Resolution of the principal questions presented by this appeal depends upon the effect to be given, and interpretation of, the confinement clause above. To repeat the pertinent part of the clause, "If 'Such Injury' * * * shall immediately after accident wholly and continuously disable and prevent the Insured from performing any and every duty pertaining to any business or occupation, and as the result thereof is thereby confined within doors and requires regular visits therein by a legally licensed Medical or Osteopathic physician or surgeon, the Company will pay * * *."

We shall recite the facts presented later. At this time we shall set forth the first three specifications of error:

1. The court erred in giving over objection plaintiff's offered Instruction No. 4 as modified, which became court's Instruction No. 9 as follows:

"With respect to the question as to the intention of the parties in the use of the clause 'and as the result thereof is thereby necessarily confined within doors.'

"You are instructed that under the law such language does not mean that the plaintiff must be actually confined *within his home* continuously to recover. If you find by a preponderance of all the evidence that the *plaintiff is disabled* to such an

extent that he cannot perform all substantial and material acts necessary to the prosecution of any and every business or occupation then the fact that he is not necessarily confined within doors is immaterial and he may nevertheless recover." (Emphasis added.)

2. The court erred in refusing to give defendant's offered Instruction No. 13 as follows:

"You are instructed that before plaintiff can receive any recovery in these cases he must prove by a preponderance of the evidence the following four conditions:

"First, that he sustained injuries caused solely by reason of an automobile accident during the period of time the policies of insurance were in effect;

"Second, that such injuries wholly and continuously disabled him and prevented him from performing any and every duty pertaining to any business or occupation;

"Third, that as a result of said injuries he was confined within doors; and

"Fourth, that while he was confined within doors his injuries required regular visits therein by a legally licensed physician or surgeon.

"You are further instructed that before the commencement of this action the defendant paid to the plaintiff under the policies of insurance for the period between January 14, 1960, and February 17, 1960, at the total rate of $450.00 per month; and that the only period of time to be considered by you in these cases is the period subsequent to February 17, 1960."

3. The court erred in refusing to give defendant's offered Instruction No. 18, as follows:

"The term 'confined within doors' does not mean confined within his home in a state of complete helplessness. He is permitted to leave the home for medical attention or healing purposes; but he cannot leave the home or be able to leave the home for primarily business, recreational or other personal reasons. If you find from the evidence that plaintiff was able to

leave his home for primarily business, recreational, or other personal reasons, as contrasted with medical attention or healing purposes, then he was not 'confined within doors,' and cannot recover payments during such period of time. Such payments terminate at the time he was no longer confined within doors as herein defined."

As set forth above, it is clear that the trial court instructed the jury that neither confinement within doors nor regular medical treatment within the place of confinement were required. The appellant charges that this ignored the confinement requirements of the unambiguous confinement clauses of the three contracts and ignored the respondent plaintiff's uncontradicted and undisputed testimony with respect to extensive, continuous and substantial nontherapeutic activities.

Now, the facts, as testified to:

At the time of the accident, the plaintiff was a retired rancher and Government employee, of the age of 67 years, residing with his wife in Billings. He was assisting and overseeing his son in the operation of a ranch south of Forsyth, Montana, which he owned. He testified that he had run a cow camp of his own in the Summer and Fall of 1959, and early part of 1958, on the Cheyenne Indian Reservation and that he had helped with the operation of his ranch (then operated by a lessee) during that same time. He sustained a heart attack in November 1958, and was hospitalized as a result thereof, but resumed the operation on the Cheyenne Indian Reservation around June 1, 1959. Prior to 1956, Mr. Wolff had been employed for 18 years by the United States Government as a Superintendent of Pest Control Activities. This job was partly an office job and partly involved field work, largely of an organizational nature, but also required some physical effort and actually going into the fields for surveys, etc. He retired from this job in 1956, and at that time applied for a disability retirement, which was denied. He was however, given a partial disability rating by his attending physician, Dr. Sterling Hay-

ward, of 25 percent as compared with the body as a whole as far as his back was concerned, and 15 percent disability as compared with loss of the arm at the wrist-joint. This rating for permanent partial disability was based upon injuries received in another automobile accident in October 1955.

The undisputed evidence showed that following the plaintiff's discharge from the hospital on February 17, 1960, he was very active, giving attention to his business interests to the extent required, and that he carried on much as any other retired man, considering his physical infirmities existing both before January 14, 1960, and his recuperation from injuries received in the automobile accident occurring on the aforementioned date. All of the testimony as to his activities was his own and that of his wife, Bertha Wolff. Their composite testimony shows that while the plaintiff's activities were somewhat restricted following his discharge from the hospital, he was ambulatory, admittedly with the aid of crutches, but nevertheless, ambulatory and not confined. Between February 17, 1960, the date of his hospital discharge, and until June 1960, plaintiff returned about every two weeks to his doctor's office. He traveled to the doctor's office either by taxi or by automobile driven by his wife. In June 1960, he traveled alone by bus to Miles City, Montana, for the purpose of receiving treatment at the Veterans Administration Hospital located there. He returned after 16 days by automobile driven by his wife.

Sometime prior to September 1960, he visited his lawyer's office in Billings in connection with other litigation pertaining to his ranching operations south of Forsyth, Montana. In September 1960, he traveled to Forsyth by automobile to attend the trial of that lawsuit, arriving sometime in advance of the trial, and sat through four days of trial. He was on the witness stand for the greater part of one day during the trial.

In October 1960, and again in November, he made a short trip to the Veterans Administration Hospital at Miles City. His wife drove him on each trip, although he stated that he may have driven some himself during the November trip.

Since the accident, Mr. Wolff and his wife have made two or three automobile trips a year to Sheridan, Wyoming, to visit Mrs. Wolff's mother. Mr. Wolff was not sure when the first of these trips was made after his accident, but believed it was by June 1961, and he and his wife shared the driving involved.

Mr. Wolff at one point testified that he visited his ranch once before the end of the hunting season in 1960, and kept the books and records for the ranch during that year. He also consulted with his son about the operation of the ranch.

In 1961, besides continuing to keep the ranch books, he resumed church attendance, attending two or three times during the year, and commenced making occasional trips to the Billings State Bank in Billings. He also made at least two trips to Sheridan, Wyoming, to visit his wife's mother and began to attend occasional meetings of his lodge and other organizations. After March 1961, he was able to get about with a crutch and a cane, and about six months later he shifted to two canes. He made trips to the Veterans Administration Hospital by train, alone, in January, March, and possibly in June, and in September 1961, he made a trip to the Veterans Administration Hospital by automobile. He believes that he may have driven part of the way himself on this last trip.

In November 1961, Mr. Wolff and his wife flew to San Francisco, where they spent eight to ten days visiting Mrs. Wolff's relatives and friends, and sightseeing in the San Francisco Bay area. Sometime in the autumn he visited his ranch south of Forsyth, accompanied by his daughter, and did some hunting on the ranch. He stated that this hunting was done from within or near an automobile, but that he did get a deer in the Fall of 1961.

Commencing sometime in 1962, he started a daily routine which included about one to one and one-half hours outside of the home, buying groceries, running errands for his wife, etc., and doing some dishes, etc. In addition, starting in 1962, he mowed the lawn at his home with an electric lawnmower, fre-

quently, however, mowing only a portion of the lawn on one day, and the remainder on another day. These activities had continued up to the time of trial. He was also continuing to attend lodge meetings and meetings of other organizations, approximately three to five times a year. The organizations included the National Association of Retired Civil Employees.

In addition to one automobile trip to the Veterans Administration Hospital in March, and two or three trips to Sheridan, Wyoming, to visit his wife's relatives, his travels in the year 1962 included the following:

(a) In April he traveled alone on the train to Minneapolis, Minnesota, for the purpose of consultation at the Veterans Administration Hospital at Fort Snelling;

(b) In November 1962, the plaintiff and his wife made a trip by plane to New York City in order that the plaintiff might appear on the television program "The Price Is Right." The plaintiff was in New York for approximately four days, during which time he not only appeared on the television program, but took a Grey Line trip and a sightseeing tour around Manhattan Island, and went out to dinner one night with his wife's nephew;

(c) The plaintiff traveled to his ranch in Forsyth on at least two occasions in 1962, in both instances to show a buyer stock he was selling. In one instance he drove his own automobile to Hysham, Montana, picked up the buyer and drove on, with the buyer's assistance, to the ranch. In the second instance, a friend at Billings drove him and the prospective buyer there and back;

(d) The plaintiff apparently was at the ranch at least on one other occasion in 1962, for he recalls having hunted a deer from the car; and

(e) In April he traveled with his attorney to Helena, Montana, where he spent two nights. This trip was in connection with an appeal to the Montana Supreme Court from a judg-

ment rendered in the District Court following litigation in Forsyth pertaining to his ranch.

He testified that commencing in March 1962, he had been able to get around with only one cane. He had also started making hospital visitations to sick friends, and estimated that he had made approximately twelve such visitations in the two years preceding the trial.

In 1963, besides continuing the daily routine involving running errands, housework, doing dishes, etc., attending church occasionally, and attending meeting of various organizations, his activities included the following:

(a) In August, he attended the Midland Empire Fair at Billings;

(b) In June, he attended a one-day horse show at Forsyth, Montana;

(c) In March, he traveled by train alone, to Dickinson, North Dakota, and attended a sale of the remainder of his cattle at a sale there;

(d) In May, he attended a Stockgrowers' Convention in Billings, which occupied the greater part of a day, together with a banquet in the evening;

(e) Sometime in the year he made a trip to Dayton, Wyoming, and Sibley Lake camp, staying over two nights in a camper placed on a pickup won on "The Price Is Right." This trip also included one night at Red Lodge, Montana, through which they returned;

(f) He attended several meetings at the PCA office in Billings, relating to the sale of his ranch, and prior to that time kept the books on the ranch operations, handled the payments of most of the bills and generally advised his son pertaining to the operation of the ranch; and

(g) He also got a deer in 1963, again by shooting the same from the car.

The claimant's daily routine continued without substantial change in 1964, but he made a number of trips during that

year, particularly in the summer. In June, he attended another horse show at Forsyth, lasting one day. Also in June, he and his wife made a trip in the camper to Waterton Parks, Canada, and were gone four nights. In the latter part of July and early part of August, he and his wife took the camper back to Wisconsin and were gone for approximately ten days. While in Wisconsin they took a side trip to Chicago to visit his wife's sister and were there two nights. In the latter part of August, Mr. Wolff, his wife, and two of his granddaughters, took the camper to Virginia City, through Yellowstone Park, and to Cody, Wyoming, on a trip lasting about four nights. In addition, Mr. and Mrs. Wolff took approximately three trips to Sheridan, Wyoming, to visit Mrs. Wolff's mother, and Mr. Wolff went to the Veterans Administration Hospital at Miles City in February and March for treatment of an elbow infection resulting from the use of the crutch. In addition to all of the foregoing travels, Mr. Wolff had occasionally attended meetings of such organizations as the Masonic Lodge, Scottish Rite, White Shrine, Shrine, American Legion, Veterans of World War I, York Rite, and the National Association of Retired Civil Employees. He had been elected president of the local chapter of the National Association of Retired Civil Employees at the last meeting of the organization prior to the time of trial.

Our long recitation shows clearly that regardless of the extent of the respondent's disability, he was not confined within doors nor did he have regular medical treatment while confined within doors. This is crystal clear as to all periods after September of 1960. We shall revert to the period between February 17, 1960 and September 13, 1960, later.

Thus, the effect of the trial court's instruction number 9 and refusal to give defendant's proposed instructions 13 and 18, did eliminate the confinement clause. The jury returned a verdict for the entire amount demanded by respondent, $25,650.00. The appellant's position is that the trial court rewrote the contract to delete the confinement clause.

Confinement clauses in health and accident policies have been construed by the courts in many cases, a number of which are discussed in 29 A.L.R.2d 1408. We have not heretofore construed such a provision in Montana. We have, however, set forth guidelines. R.C.M.1947, § 93-401-15, prohibits the omission of what has been inserted. In James v. Prudential Insurance Co., 131 Mont. 473, 477, 312 P.2d 125, 127, the court stated:

"The plaintiff urges a number of cases to the effect that an uncertain contract should be interpreted most strongly against the party causing the uncertainty. Such is the Montana rule. R.C.M.1947, § 13-720. But even though it is a cardinal principle of insurance law that a contract of insurance is to be construed liberally in favor of the insured and strictly against the insurer, contracts of insurance should be given a fair and reasonable construction. Park Saddle Horse Co. v. Royal Indemnity Co., 81 Mont. 99, 111, 261 P. 880. In arriving at such construction, no matter how strictly construed against the insurer, the intention of both insurer and insured is to be ascertained from the language of the policy. R.C.M.1947, § 13-704. Effect must be given to every part of the policy contract. R.C.M.1947, § 13-707. The words of the contract are to be understood in their usual meaning. R.C.M.1947, § 13-710. Common sense controls." In the James case this court found no ambiguity.

In Schroeder v. Metropoliton Life Insurance Co., 103 Mont. 547, 558, 63 P.2d 1016, 1019, this court said:

"The rule is well established that, in the absence of fraud, and questions of public policy, controversies arising out of contractual relations must be determined from the contract as made, not by new ones contrived for the parties by the courts. Story Gold Dredging Co. v. Wilson, 99 Mont. 347, 42 P.2d 1003, and cases cited. Courts universally recognize the rule of liberal construction of life insurance policies in favor of the insured and against the insurance company (Parke v. New York Life Insurance Co., 95 Mont. 503, 28 P.2d 443, and cases cited), but

such contracts are otherwise subject to the same rules of construction that apply to contracts generally, and such liberal construction must not be carried to the point of abrogating vital provisions in the contract and substituting new ones contrived by the courts."

We have heretofore noted the defendant's offered instruction 18 which we believe properly sets forth the rule in Montana. An instruction similar to instruction 9, given by the trial court was specifically disapproved and the judgment reversed in Rice v. American Protective Health & Accident Co., 157 Neb. 256, 59 N.W.2d 378, wherein it was said:

"What the instruction did was to apply to the confining illness the proper definition of total disability under an accidental injury policy of insurance. [Citing cases.]

"Confining illness, to the extent reasonably possible, is defined and considered at length in Mutual Benefit Health & Accident Ass'n. v. Milder, 152 Neb. 519, 41 N.W.2d 780. Numerous other cases are cited therein supporting the conclusion reached and they will not be repeated here.

"In that opinion, among other related statements with regard to contract provisions substantially the same as those being considered here, it was said: 'Mere total and permanent disability of the insured by disease or illness is not sufficient. The contract makes total disability and total loss of time from sickness or disease which confines the insured continuously within doors and regular visits therein of the insured by a legally qualified physician an indispensable criterion of disability which entitles the insured to the maximum indemnity.' * * *

"Also in the opinion in definition of confinement within the meaning of the contract, it was said: 'The condition imposed by the contract that continuous confinement within doors with regular medical attendance is a requirement of recovery of maximum indemnity for total disability and total loss of time occasioned by illness or disease should not be literally but rea-

sonably applied, and the insured is not thereby required to remain within doors constantly, but there must be a substantial confinement within doors and regular medical attention therein by reason of the illness. There may be needful and beneficial interruption of the confinement with the approval and advice of his physician in attempts to restore the health of the insured, and there may be necessary deviation from confinement indoors on account of occurrences or emergencies over which he has no control, but this does not mean that the requirement of confinement within doors may be ignored or disregarded, and recovery had under this provision of the policy merely because insured is totally disabled and suffers a total loss of time.'

"Instruction No. 6 was prejudicially erroneous and on that ground the defendant is entitled to a reversal of the judgment herein."

We find the Nebraska discussion to be consistent with our own enunciated principles. Plaintiff-respondent's brief here would suggest that confinement clauses are against public policy and should be stricken. We have found no authority for this position and plaintiff-respondent has cited none. That a "liberal construction" of confinement clauses has been adopted in a great many states is true as indicated in the annotation in 29 A.L.R.2d 1408, cited above. Our own holding here is within "liberal construction" cases since we approve of offered instruction 18. We shall not further lengthen this opinion by further discussion of cases dealing with liberal, strict, or middle of the road interpretations.

We hold that specifications of errors 1, 2 and 3 are well taken.

Now, however, we concern ourselves with specifications of error 4, 5 and 6. Specification of error 7 concerned with hypothetical questions to medical witnesses will not be discussed as we fail to see any prejudice in view of the other matters herein discussed.

Error 4 is that a directed verdict should have been granted defendant. However, as noted heretofore, the period of

time between plaintiff's discharge from the hospital on crutches on February 17, 1960, until plaintiff's participation in litigation in Forsyth on September 13, 1960, was left until now. Appellant-defendant Insurance Company put on no proof except one medical witness. All of the evidence came from plaintiff and his wife. Under their testimony, the only nonconfinement testified to was in June 1960, a trip to the Veterans Administration Hospital in Miles City where plaintiff was hospitalized. This can hardly be conclusively classed as nonconfinement under offered instruction 18. The only proof was plaintiff's statement to the effect that he was for all practical purposes confined. His first venture, really, for other than therapeutic reasons under the proof was to Forsyth on September 13, 1960. Therefore we hold that the trial court was not in error in denying the motion for directed verdict. Under the evidence, at least an issue for the jury was present.

Having determined that the motion for directed verdict was properly denied, we turn to specification of error 5. The appellant-defendant moved the court to direct the jury that its verdict under the proof could not exceed $3,090.00, or the monthly indemnity payable between February 17, 1960, and September 13, 1960. This period of time is between discharge from the hospital and what would appear to be under the proofs of this record the first real and definite nontherapeutic venture to attend trial proceedings at Forsyth. In the interim, plaintiff had taken one trip to the Veterans Administration Hospital at Miles City. After September 13, the departures from within doors were numerous, regular and varied in purpose. As mentioned before a jury question was presented as to whether plaintiff was confined as defined in dependant's offered instruction 18. At the very least, the defendant was entitled to a new trial as contained in its motion.

Now, however, as to specification of error 6. It reads that the, "Court erred in denying defendant's motion for judgment in accordance with the motion for directed verdict or new trial."

In the proceedings, after the trial court denied a motion for directed verdict on the basis that no proof of confinement had been made, a motion, in part, as follows was made:

"This motion is made upon the ground that the evidence shows conclusively that the plaintiff was not confined within doors as required by the policies after September 13th, 1960 * * *."

This we believe to be an admission by defendant of liability in the amount of $3,090.00. In an effort to avoid further litigation, the cause is remanded to the district court, with directions to grant a new trial in accordance with this opinion, unless within ten days after the remittitur is filed with the clerk of that court, the plaintiff shall file his written consent that the judgment may be reduced to $3,090.00, together with interest at 6 per cent thereon since September 13, 1960. If consent is given, the judgment will be modified accordingly and, as modified, will stand affirmed.

In case the reduction is accepted by respondent, each party shall pay their own costs on this appeal, but in case the reduction is not accepted and the judgment finally stands reversed, appellant shall be entitled to costs as in ordinary reversals under the rules of this court. See Alexander v. State Highway Commission, 147 Mont. 367, 412 P.2d 414.

It is so ordered.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN C. HARRISON, DOYLE and ADAIR concur.