CROWELL v FEDERAL LIFE AND CASUALTY COMPANY

1. INSURANCE—HEALTH INSURANCE—HOUSE CONFINEMENT—FACTORS IN INTERPRETATION.

The key factors in the interpretation of a so-called "house confinement" clause in a health insurance policy, which pays benefits if the insured is confined to his residential premises except for necessary visits to a doctor or hospital for treatment, are (1) whether the individual is substantially confined and (2) the distinction between therapeutic purposes and business or personal purposes for leaving the premises.

2. INSURANCE—HEALTH INSURANCE—HOUSE CONFINEMENT—SUBSTANTIAL CONFINEMENT—THERAPEUTIC ACTIVITIES.

A heart-attack victim, insured under a policy of health insurance, was substantially confined to his home for purposes of a "house confinement" clause in the insurance policy, even though he was able to leave his home for short shopping trips or to take walks, where such activities were encouraged by his physician for therapeutic reasons.

3. INSURANCE—HEALTH INSURANCE—HOUSE CONFINEMENT—SUBSTANTIAL CONFINEMENT—THERAPEUTIC ACTIVITIES.

An insured under a policy of health insurance is entitled to payment, under a clause which provides for payment if the insured's illness confines him to his premises, if the insured is substantially confined and his activities outside his home are for therapeutic reasons rather than for business or personal reasons.

Appeal from Muskegon, John H. Piercey, J. Submitted Division 3 March 5, 1975, at Grand Rapids. (Docket No. 20070.) Decided May 29, 1975.

Complaint by Gerald Crowell against Federal

REFERENCE FOR POINTS IN HEADNOTES

[1-3] 44 Am Jur 2d, Insurance § 1622.

When is one confined to house within meaning of health or accident insurance policy. 29 ALR2d 1408.

Life and Casualty Company for payment of benefits under an insurance policy. Judgment for defendant. Plaintiff appeals. Reversed.

*White, Spaniola, Knudsen, Stariha & Potuznik, P. C.* (by *David B. Merwin),* for plaintiff.

*Landman, Hathaway, Latimer, Clink & Robb* (by *William M. Newman),* for defendant.

Before: D. E. HOLBROOK, P. J., and BRONSON and M. J. KELLY, JJ.

D. E. HOLBROOK, P. J. In September of 1966, Gerald Crowell entered into an insurance contract with Federal Life and Casualty Company. The pertinent portions of that insurance policy state:

"Policy section 3
* * *

| "D. Total Disability—Sickness | Monthly indemnity $200 | 24 Months for any one Sickness |
|---|---|---|
| (1) Non-confining or confining sickness | | |
| (2) Confining Sickness and continued Disability after (D1) | Monthly Indemnity $200 | Lifetime for any one Sickness |

* * *

" 'Confining Sickness', means that as a result of Sickness the Insured is confined to his residential premises or yard, except for necessary visits to a hospital or doctor's office for treatment.

" 'Total Disability', means that as a result of Injury or Sickness, the Insured is under the regular care and attendance of a duly licensed doctor of medicine or osteopathy, other than himself, is completely unable to perform each and every duty pertaining to his occupa-

tion and is not gainfully employed in any other occupation, except that if a monthly indemnity has been paid for 12 months during any period of continuous total disability, then for the balance of the period of such continuous total disability, the term total disability in addition shall mean the complete inability of the Insured to engage in any gainful occupation for which he is reasonably qualified by education, training or experience."

The total annual premium for the policy was $201.50.

In March of 1969, Gerald Crowell had a severe heart attack. As a result of that heart attack, he was disabled. He had been employed by the Continental Motors Company and operated a used-car lot. Federal Life and Casualty paid to Crowell benefits under Section 3D(1) of its insurance policy. That section provided benefits for 24 months. Federal Life and Casualty paid approximately $6,-500 under this provision.

Federal would not pay under Section 3D(2) because it found Crowell unqualified under the confinement clause. On October 27, 1971, Crowell filed suit in Muskegon County Circuit Court claiming payment of proceeds under Section 3D(2).

Apparently due to what was considered to be detrimental to plaintiff's health, a trial before the court without a jury and without plaintiff's presence was conducted. Defendant presented the testimony of its chief claims examiner, but, in the main, reliance was had upon the depositions of plaintiff's treating doctor, Claude VanAndel, D. O., the examining physician engaged by defendant, David A. Amos, M. D., and plaintiff. In a written opinion, the trial judge found: "I am persuaded that the greater weight of evidence is that he is totally disabled and can not engage in gainful

employment without danger to his health. There is no serious contention of counsel for the defendant in that this is not the case."[1] The court held:

"However, the court is of the opinion that I may not enlarge upon the terms of the written agreement between the parties so as to render meaningless the contractual definition placed upon confining illness. Courts are obligated to refrain from rewriting contracts that are not ambiguous and I can find no ambiguities within the meaning of the confinement clause of this contract which would require going beyond the boundaries of the contract for clarification."

Judgment was entered for the defendant on March 27, 1974. The plaintiff appeals.

While the "confinement clause" may be reviewed generally as a single, unitary concept, it may be written in a wide variance of language, which will obviously lead to differences in construction and application. See Anno., *When is one confined to house within meaning of health or accident insurance policy,* 29 ALR2d 1408, 1424. In general, it is said in 1A Appleman, Insurance Law & Practice, § 652, p 570:

"The courts recognize that it is just such provisions as these which have brought health policies into disrepute, to the point where the public believes that the 'big print gives it to you, and the little print takes it away'. Since the buying public is not aware of the meaning of the average limited risk contract, the courts will hold them to be as little restrictive as possible. Such provisions as these are, at the most, considered a mode of determining the condition and extent of illness rather than a means of regulating an insured's conduct,

---

[1] Defendant's counsel, during the deposition of Dr. VanAndel, D. O., made the following statement: "There isn't any question but what Mr. Crowell is totally and probably permanently unable to engage in any meaningful occupation for remuneration or profit."

and refer to a substantial confinement, or a condition which requires that a substantial part of the insured's time be spent indoors." (Footnotes omitted.)

A review of the development of interpretation of this clause, throughout the country, discloses widely divergent approaches and conclusions. Possibly the best discussion is found in the exhaustive analysis in 29 ALR2d, *supra, et seq.,* and Later Case Service. The annotator did conclude that "the great majority of cases support the so-called liberal construction view". (Footnotes omitted.) *Id.,* at 1412.[2] It is written, at 1413, that:

"Two quite generally accepted doctrines, with reference to the insured's right to recover under a specific factual situation, emerge from the cases.

"The first of these is the doctrine that 'house confinement' clauses are not violated where the insured occasionally departs from within the four walls of the house for the purpose of getting fresh air and exercise, in a bona fide attempt to improve his health, particularly where such departures are undertaken by the direction of a physician, or where he visits his physician's office or a hospital for examination and treatment.

"On the other hand, where the insured is able to, and does, leave his house for primarily business or other non-therapeutic records, he can no longer be considered within the scope of a 'house confinement' clause." (Footnotes omitted.)

The key factors would seem most often to be (1) whether the individual is substantially confined

[2] *See Mutual Benefit Health & Accident Association v King,* 55 Tenn App 72, 75; 396 SW2d 94, 95 (1965), *cert den,* citing Anno., *When is one confined to house within meaning of health or accident insurance policy,* 29 ALR2d 1408, 1415–1418, *Wolff v Standard Life & Accident Insurance Co,* 147 Mont 460, 471; 416 P2d 11, 17 (1966), *Manuel v American Income Life Insurance Co,* 254 La 316, 321–322; 223 So2d 817, 818–819 (1969).

and (2) the distinction between therapeutic pur-
poses and business or personal purposes.[3]

In Michigan, the development of the interpreta-

---

[3] This approach is often found in cases dealing with this problem,
see, e.g., *Kluge v Benefit Association of Railway Employees,* 276 Minn
263, 271–272; 149 NW2d 681, 687–688 (1967), where the Court wrote:

"The law with reference to the so-called 'house confinement clause'
has been discussed at length in recent decisions of this court. *Struble
v Occidental Life Ins Co,* 265 Minn 26; 120 NW2d 609 (1963). In
*Struble* we pointed out that each case depends largely on its particu-
lar facts and the language of the contract. It is recognized that this
type of clause should be construed liberally in favor of the insured.
The construction should be reasonable in light of the facts in the
particular case. Ordinarily, the continuous confinement required by
the policy does not necessitate actual confinement within the walls of
the house constantly and without interruption, and a claim for
confining illness will not be defeated by the fact that the insured has
gone out occasionally, as for example, to take exercise, to visit a
physician or, as in the *Struble* case, to engage in those therapeutic
activities which the physician prescribes. We have followed the liberal
rule which holds that substantial confinement by reason of an illness
or accident constitutes a sufficient compliance with the requirements
of the clause. The clause is intended to describe the required extent of
the insured's illness or other disability rather than to impose a strict
limitation upon his conduct. Annotation, 29 ALR2d 1408, 1412. But
even under a liberal construction of the house confinement provisions,
where the insured is able to, and does, leave his home for primarily
business or other personal, as contrasted with therapeutic, reasons, it
is generally held that he is precluded from recovering benefits for
house confinement illness or accident. *Benson v Continental Cas Co,*
275 Minn 544; 146 NW2d 358 (1966); 29A Am Jur, Insurance, § 1530."
*See also Cassady v United Insurance Co of America,* 370 F Supp 388,
395 (WD Ark, 1974), quoting from *Colorado Life Co v Steele,* 101 F2d
448 (CA 8, 1939), and *Manuel v American Income Life Insurance Co,*
supra, fn 2, La 328; So 2d 820. In *Cassady,* p 396, Senior District
Judge John Miller wrote quoting *Michigan Life Ins Co v Hayes,* 231
Ark 614, 622; 332 SW2d 593 (1960): "Certainly it is reasonable for one
to go outdoors for fresh air — to visit with friends — to walk for
exercise — to pick up mail — to sometimes engage in other activities
for pleasure, and to even engage in occasional work." Cf. *Manuel v
American Income Life Insurance Co, supra,* fn 2, La 329; So 2d 821,
where it is said:

"[A] fair reading of the testimony of the physician, as a whole, was
to the effect that plaintiff could do these things *if* he felt able to do so,
and that he should immediately desist if he felt fatigued or suffered
chest pains, with the distinct possibility — even probability — that
these symptoms would occur. This testimony is but in line with what
is commonly known to be the treatment in such heart cases — to let
the patient 'pace himself', and to increase his activity as he is able,
consistent with his reaction thereto." (Emphasis in original.)

tion of this clause is no less unclear than in the country as a whole. In *Hoffman v Michigan Home & Hospital Association,* 128 Mich 323, 328; 87 NW 265, 267; 54 LRA 746, 748 (1901), the Court approved an instruction given by the trial judge which stated, in pertinent part:

" '[I]f you find from the testimony in this case that the plaintiff was continuously confined to his home on account of a sickness or disease covered by the terms of his policy, to the extent that he was necessarily, in good faith, there the larger portion of the time, and only went forth either from necessity for consultation with, or by direction of, his physician, Dr. Barth, in whose charge and care he was, if you so find, then and in that case the plaintiff is entitled to recover for the term so continuously confined * * * .' "

This would appear to fall within the substantially confined criterion. However, *Hoffman* was distinguished in *Shirts v Phoenix Accident & Sick Benefit Association,* 135 Mich 439, 443–444; 97 NW 966 (1904), seemingly on the basis that "the circumstances of [that] case are so different that it does not fall within the rule there [in *Hoffman]* stated".

Further, a review and comparison of the clauses as written in *Hoffman* and *Shirts* reveals small but distinct differences in language.

*Shirts* was relied on in *Cooper v Phoenix Accident & Sick Benefit Association,* 141 Mich 478; 104 NW 734 (1905), where the clause in question conditioned liability upon the insured being "necessarily, entirely, and continuously confined to the house and subject to the calls of a registered physician in good standing".

A more liberal approach was taken to the problem in *Van Dusen v Interstate Business Men's*

*Association of Des Moines, Iowa,* 237 Mich 294; 211 NW 991 (1927). That case relied upon *Letherer v United States Health & Accident Insurance Co,* 145 Mich 310; 108 NW 491 (1906). The *Letherer* decision involved an issue of disability.[4]

Without clear precedent to guide us, we approach this case under general tenets of insurance law, *e.g.,* liberal construction in favor of the insured and in favor of coverage,[5] and believe the majority rule is the proper frame of reference. See *Manuel v American Income Life Insurance Co,* 254 La 316, 324; 223 So2d 817, 820 (1969), where the Court stated: "It appears to us that in view of the purpose to be served by such insurance, and the intention of the insureds when securing it, that the liberal interpretation rule is the better one to follow, * * * ".[6]

In plaintiff's deposition the following appears:

"*A.* [I]n case my wife happens to go to the store, I like to go along. I can walk in the store without being in a hurry. I can take my time and walk or stroll.

"*Q. [by Mr. White, plaintiff's attorney]:* Go around the store?

"*A.* Right; and if I get to feeling bad, I can walk back to the car and sit down.

"*Q.* This same thing happens once or twice a week?

"*A.* When I get bored walking around in the house, I get her to take me to Yankee's, or someplace where I can take my time, look at something, and look around.

---

[4] For a discussion of *Hoffman, Shirts,* and *Letherer, see Ebert v Prudential Insurance Co of America,* 338 Mich 320, 328–331; 61 NW2d 164, 168–170 (1953).

[5] *See,* for instance, *Arrigo's Fleet Service, Inc v Aetna Life & Casualty Co,* 54 Mich App 482, 487; 221 NW2d 206, 209 (1974), *lv den* 392 Mich 812 (1974).

[6] It is apparent that, with the diversity of decisions, cases may be found supporting most any conclusion. Defendant has cited us selectively to cases which *may* be viewed as giving such support.

"*Q.* You walk around your home, around your neighborhood?

"*A.* Yes, in the yard. I get out and walk around in the yard.

"*Q.* You have a dog?

"*A.* Yes, I have a Boston bull terrier that I take with me, just walk him around in order to be walking.

"*Q.* OK. What do you do for exercise, Jerry, when, say, it is a bad rainy day out?

"*A.* Walk around from one room to another in the house, and walk out to the garage—we have a connecting garage.

"*Q.* Do you do that regularly?

"*A.* I try to.

"*Q.* When you can't get outside?

"*A.* Yes.

"*Q.* Has the doctor told you to walk each day?

"*A.* Yes, because if I don't, I have a tendency to stiffen up.

"*Q.* OK. What I am asking is: You do try to get exercise each day then, right?

"*A.* Yes.

"*Q.* And the doctor told you to do this?

"*A.* If I possibly felt like it, I should do it."

He also stated that, on occasion, he would drive his automobile, *e.g.,* to go three or four blocks to pick up his daughter when she got out of school. He said that, on occasion, he would pick up his mother and take her to the store. He estimated that, in total, he did approximately 10% of the family driving around town or on short trips.

The examining physician of defendant stated that plaintiff had told him that his walking might total 2-1/2 to 3 miles a day. The doctor answered positively to the assertion that "current medical practice calls for the recommendation of as much activity as the individual in such cases as these is able to tolerate, short of symptomatology". This

doctor had seen plaintiff three times. He stated that over this period of time plaintiff's description of his walks showed an increase in distance, although he did state that he didn't think that plaintiff meant to say he walked 2-1/2 miles every day. The following appears:

"*Q. [by Mr. Flynn (Newman), defense attorney]:* Is there any reason—any medical reason why Mr. Crowell must necessarily limit himself to his yard or home, except for trips to the doctor's office or trips to the hospital, or other venturings from the home for visits or otherwise, that are strictly limited to a therapeutic value, a therapeutic recommendation—is there any reason why he must be so limited?

"*A.* I wouldn't see why.

"*Q.* I will ask you, based upon the history that you took, the medication Mr. Crowell indicated he was taking, and the pathology you confirmed, I will ask you whether Mr. Crowell is substantially free to come and go as he pleases, subject only to avoiding stressful situations or strenuous activity which would prompt potentially, pathalogically aggravating angina or dyspnea? Is he able to engage in that kind of activity or to come and go substantially as he pleases most of the time?

"*A.* Yes."

Further, when cross-examined by plaintiff's counsel:

"*Q.* You mentioned to him, you said that if he could go out and attend to some personal matters, say get a haircut, he can go get a haircut, and that he can do that just because he wants to go get a haircut as opposed to performing some therapeutic function—and that is true, is it not, that he can just go do that, and that is not a necessary thing for him to do, for the therapy is it?

"*A.* Right.

"*Q.* —but it is therapy for him to do that, isn't it?

"*A.* It is therapy for him to get a haircut.

"*Q.* To go in and get a haircut as opposed to sitting in the house all day—to get out and do things?

"*A.* That is part of the therapeutic program, yes."

Plaintiff's treating physician had informed the defendant that plaintiff had suffered a myocardial infarction with an ongoing profile of angina. He stated that, at the time of the deposition, plaintiff was taking Digitalis, Nitrobid, Coumadin, Bentyl, and Nitrostat (which had replaced Nitroglycerine). He further said that in the past plaintiff had taken Hygroton for high blood pressure. The following pertinent colloquy occurred:

"*Q. [by Mr. White, plaintiff's attorney]:* I believe that you indicated that on several occasions you answered—I think on four occasions—by the printed forms, they asked you a question: 'Was patient confined to the house?'—and you said, 'No.'

"Well, of course he is not confined to the house, is he?

"*A.* No.

"*Q.* All right. And I think that you mentioned he is able to come to your office for treatment, correct?

"*A.* Yes.

"*Q.* And could go to the hospital for treatment, if necessary?

"*A.* Yes.

"*Q.* Is it any more strenuous, from your experience, for the man to get in the car and ride to the store with his wife and come home, than it is to go to the doctor's office?

"*A.* No.

"*Q.* Is it any more strenuous, detrimental to his health, to be able to get in the car and ride over and have a visit with a friend, than it is to come over and visit his doctor?

"*A.* No.

"*Q.* So the activities he engages in, I understand,

would be no more strenuous than the regular activity he must engage in to see you or to go to the hospital?

"*A.* Right."

Plaintiff's doctor also specified that it was his conclusion that plaintiff was a man prone to far greater nervous activity, and simple anxiety, than most persons. He stated:

"That is why I say, as far as he is concerned, psychologically, it will be bad for him to say he is house-confined or yard-confined, like if he was a prisoner, you might say.

"So, again, I cannot restrict him to the house or just to the yard, because, like I say, he is able to come to the office; so therefore he is able to come to the office, he feels up to this—up to this physically,—then he can go with his wife to the grocery store or to the gas station or to get a haircut, things like that."

The doctor gave the rather clear implication that much of plaintiff's activities were prescribed by him for psychological and physiological purposes.

Taking the totality of plaintiff's activity, it cannot be said that he is other than substantially confined to his home. There is no showing that plaintiff went out for business purposes, nor, to any great extent, for personal purposes other than advised by his doctor.

In *Struble v Occidental Life Insurance Co of California,* 265 Minn 26; 120 NW2d 609 (1963), plaintiff was suffering from a "chronic anxiety reaction and a chronic depressive reaction". There plaintiff had even attempted employment for therapeutic reasons. He had painted his house, repaired a fence, done other work around his home and engaged in certain limited social activities. The Court wrote, at 265 Minn 31–32; 120 NW2d 613–614:

"We are thus faced with the problem of whether or not the confinement clause contained in Part 7, § B, of the policy operates to bar recovery of benefits by the insured beyond the 24 months allowed under Part 7, § A, where the illness is such that, even though covered under the policy, it does not require confinement and where, if such clause is interpreted as being mandatory, it is both inconsistent with the medical advice of his physician and if complied with would tend to worsen rather than improve the insured's mental health."

The Court held at 265 Minn 38; 120 NW2d 617:

"We accordingly conclude that, under the particular contract before us as applied to the facts of this case, the *character and extent of the plaintiff's illness must control over those provisions of the policy which limit the activity of the insured.*

"Reversed with order to enter judgment for plaintiff in accordance with the verdict of the jury." (Emphasis supplied.)

See also *Gareis v Benefit Association of Railway Employees,* 284 Minn 262, 265; 169 NW2d 730, 732 (1969).

In *Mutual Benefit Health & Accident Association v King,* 55 Tenn App 72, 80; 396 SW2d 94, 97 (1965), relied upon by defendant, the Court found that there was "no material evidence that plaintiff [was] substantially confined". Likewise, in *Evans v Transportation Insurance Co,* 269 NC 271, 275; 152 SE2d 82, 85 (1967), the Court found that plaintiff's activity had been so extensive and so prolonged as to foreclose a finding of confinement, substantial or otherwise.

Justice Castles, in *Wolff v Standard Life & Accident Insurance Co,* 147 Mont 460, 465–470; 416 P2d 11, 15–17 (1966), recites in great detail plaintiff's extensive activity, which included, *inter alia,*

his appearing on the witness stand during trial, keeping of record books, church attendance, trips to a bank, hunting trips, a daily routine of 1-1/2 hours outside of the home buying groceries, running errands, mowing the lawn of his home, attending lodge meetings, trips to visit his wife's relatives, traveling alone on the train, a plane trip to New York City with the prospect of appearing on a television program, attending a fair, attending a cattle sale, going to a banquet, making a trip in a camper to Canada, etc. It is thus readily apparent that the extent of activities in the *Wolff* case is markedly different than that in the instant case, *e.g.,* plaintiff herein was even unable to attend the trial in this matter. *Cf. MacFarlane v Pacific Mutual Life Insurance Co,* 192 F2d 193, 195; 29 ALR2d 1403, 1407 (CA 7, 1951).

In *Manuel v American Income Life Insurance Co, supra,* plaintiff, formerly a school bus driver and farmer, suffered a severe myocardial infarction and was taking some seven or eight different medications for various ailments, including the heart condition. The Court wrote at 254 La 324–325, 329; 223 So2d 820, 821–822:

"Indeed, it appears that this court has already aligned itself with those cases which give a liberal interpretation to the confinement clause. Thus, in *Bankson v Mutual Beneficial Health & Accident Association,* 208 La 1008; 24 So2d 59 (1945), we pointed out that there was testimony to the effect that the insured was 'substantially' confined within doors, and we observed: 'It was never the intention of the parties that the clause in controversy should be given an unreasonable or absurd construction * * * . We think the parties intended by this clause, and we so construe it, that the insured would be permitted to recover under Part I of the policy if his disability by reason of illness was such that it would ordinarily require confinement within doors, and the fact that the patient is instructed or

allowed to leave the confines of his home for the purpose of getting fresh air and sunshine, as in the case of tuberculosis, or to take walks to prevent atrophy and weakness of the muscles, as in this case, does not necessarily deprive the insured of his right to recover under Part I of the contract. Having reached this conclusion, it is immaterial whether in taking these walks the plaintiff went around the block to the barber shop, or to the doctor's office.'

\*   \*   \*

"The facts of this case, as revealed by the record, are that this plaintiff was never able to carry on more than the minimum activities prescribed by his physician. Moreover, the doctor's reference to plaintiff's not being confined to the house was but consistent with his testimony that he advised his patient, for the betterment of the latter's condition, to get out and get some mild exercise."

The activities of plaintiff herein were for therapeutic reasons, and have not been demonstrated clearly to be for business or personal reasons. Plaintiff has been substantially confined, and, under the foregoing manner of analysis, should be paid by defendant. The absurdity of the alternate conclusion is found in the fact that if plaintiff had walked 2-1/2 to 3 miles a day in his yard, and gone out only to visit his doctor, while his life might have been miserable, depressing and possibly harmful, and antithetical to prescribed medical practice,[7] defendant would have paid and this case would not be before us. The determination of the trial court was erroneous; plaintiff is entitled to be paid in accord with this opinion.

Reversed. Costs to plaintiff.

---

[7] To force plaintiff to remain literally confined to his residential premises in order to be paid under the policy could be so detrimental to his health physically and mentally as to hasten his demise, which would, obviously, shorten the length and lessen the amount of payments to be made by the defendant.